. 639 A.2d 660

Allison NAILS et al.

v.

S & R, INC. t/a VOB Auto Sales.

No. 44 Sept. Term, 1991.

Court of Appeals of Maryland.

April 12, 1994.

Kevin G. Hessler, argued and on brief (Harvey B. Steinberg, Miller & Steinberg, on brief), Rockville, for petitioners/cross-respondent.

D. Christopher Ohly, Baltimore, argued and on brief (Thomas J. Zagami, Hazel & Thomas, P.C., Baltimore and Harry C. Storm, Abrams, West & Storm, P.C., Bethesda, on brief), for respondent/cross-petitioner.

**400**

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW and KARWACKI, JJ., and CHARLES E. ORTH, Jr.,** Judge of the Court of Appeals of Maryland (Retired, Specially Assigned).

ELDRIDGE, Judge.

We issued a writ of certiorari in this civil case to review the holding by the Court of Special Appeals that, when the jury returns a verdict, when the jury is polled, and when the parties and counsel are told that they are excused, the verdict is final and the court has no authority to submit an additional issue to the jury or request further deliberations on a matter even though the jury has remained in the box. An additional issue presented concerns the element of reliance in a fraud action.

## I.

Allison Nails and Robert Bolton were employees of S & R, Inc., trading as VOB Auto Sales (the dealership). They served as Assistant Service Managers (ASMs), and as such, were each the leader of a team of four or five mechanics.

Nails was hired as an ASM in 1983 and, except for the period between April and September 1984, served in that position until 1987. Nails was originally hired on a commission basis. Bolton was first hired as an ASM in 1984, and he served as an ASM until July 1987. Bolton was initially paid a flat salary, but he testified at the trial in the instant case that, when he was hired, he was told that his compensation would be changed to a commission system sometime in the future.

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Orth, J., retired, and specially assigned, participated in the hearing, conference, decision and adoption of this opinion but died prior to the filing of the opinion.

His compensation was changed to a commission basis in February 1985.

Nails and Bolton testified that the commission system was explained to them as follows: they were to be paid 5% of the gross dollar value of parts sold and services rendered by their respective teams, calculated on the basis of receipts instead of sales. Commissions were calculated on the basis of receipts so that an ASM would not receive a commission on a job until the dealership was paid; if the dealership never received its money, neither did the ASM.

Unknown to the ASMs, the dealership deducted 15% from the gross receipts before paying the 5% commission. The ASMs periodically noticed discrepancies between what they thought they should be paid and what they were actually paid. On several occasions, they asked management personnel to explain the perceived discrepancies. Management generally responded that there were outstanding bills, for which commissions were not yet due, and which the ASMs could not properly track. They were not told of the dealership's practice of deducting 15% from the gross receipts.

The ASMs contend that they first learned of the specific commission practice at a meeting with a new general manager of the dealership in 1987. Another ASM, similarly concerned about discrepancies between his anticipated commissions and his actual commissions, asked why his figures were wrong. The general manager responded that the ASM was failing to deduct 15% from the gross. This comment was apparently met with great surprise by all of the ASMs at the meeting, as this was the first time any of them had heard of this practice.

Nails and Bolton separately filed in the Circuit Court for Montgomery County complaints alleging breach of contract and fraud. The cases were consolidated and tried before a jury. The dealership moved for a directed verdict at the close of the plaintiffs' case, and, after it was denied, renewed the motion at the close of all the evidence. Each time the dealership argued that the plaintiffs had not proven all of the elements of fraud because they failed to prove reliance on the

misrepresentation.[1] The dealership also argued that, even if the plaintiffs had established fraud, they were not entitled to punitive damages because they had failed to prove that the dealership acted with actual or implied malice.[2] The trial court reserved ruling on the defendant's motion for a directed verdict made at the close of the evidence, and the court proceeded to instruct the jury.

After giving the instructions, the court sent the jury to deliberate, providing the jury with two special verdict sheets, one for each plaintiff, containing eighteen questions per sheet. The verdict sheets were virtually identical to those proposed by the dealership. In addition to questions concerning each element of the contract and fraud counts, the verdict sheets included the following three questions bearing on the issue of punitive damages: (1) "Did the fraud arise out of a contractual relationship?" (2) "[D]o you find that defendant acted with actual malice?" and (3) "Do you find that defendant acted with implied malice?"

The special verdict sheets did not include a question concerning whether the fraud induced the plaintiffs to enter into their employment contracts. The plaintiffs' attorneys noticed the omission and, before the jury had been provided with the

---

1. Each plaintiff was asked on cross-examination whether he or she would have taken the job had he or she known about the 15% deduction. Each plaintiff answered, "I don't know." The dealership argued that the test for reliance is whether the plaintiff would have acted differently "but for" the misrepresentation. Thus the dealership contended that because of the equivocal answers, the plaintiffs had failed to establish reliance *as a matter of law.*

2. Under our relevant punitive damages holdings, as they existed at the time of the trial, in a case of fraud arising out of a contract and occurring after the contract, a plaintiff was required to show that the defendant acted with actual malice, but in a case of fraud inducing a contract, the plaintiff only had to show that the defendant acted with implied malice. *See Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976). *See also H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975). *But see Schaefer v. Miller,* 322 Md. 297, 312–332, 587 A.2d 491, 498–509 (1991) (opinion of Judges Eldridge, Cole and Chasanow). The *Wedeman* and *Testerman* cases were overruled in *Owens–Illinois v. Zenobia,* 325 Md. 420, 452–455, 601 A.2d 633, 648–650 (1991).

verdict sheets, brought it to the attention of the court. The plaintiffs' counsel explained to the court why the omission was significant, arguing that the omission effectively foreclosed part of their case. The court responded: "Right or wrong, I am not changing this. It is going in like it is. You can object to it all you want. I am sorry. To me, it doesn't make a bit of difference. If they come up with an award of punitive damages and answer no implied malice and no actual malice, you are not getting punitive damages, even if they award them." The defense attorney was silent throughout this exchange.

The court gave the jury the verdict sheets as planned. After deliberating at length, the jurors announced that they had reached their verdicts and returned to the box. The foreperson handed the verdict sheets to the clerk, who read them aloud. The jury answered the questions identically for both plaintiffs. It found, in answer to the questions on the special verdict sheets, that the defendant had knowingly misrepresented a past or present fact, with intent to defraud the plaintiffs. It further found that the plaintiffs justifiably relied on the defendant's misrepresentation and suffered damages as a result. The jury awarded Nails compensatory damages of $11,394.52 and awarded Bolton compensatory damages of $7,686.73. The jury found for the plaintiffs on their contract claims as well, awarding damages in the same amounts.

As to the punitive damages questions, the jury found that the fraud arose out of a contractual relationship. In response to the question whether the defendants acted with actual malice, the jury said "no." In answer to the question whether the defendants acted with implied malice, however, the jury answered "yes." With respect to the final part of the verdict sheets under the tort counts, the jury awarded punitive damages in the amounts of $100,000.00 for Nails and $100,000.00 for Bolton.

After the clerk read the verdict sheets aloud, the clerk then asked: "Ladies and gentlemen, your verdict as it will be recorded, is that the verdict of all twelve of you ladies and gentlemen?" The jurors responded affirmatively. The court

then said: "Madame Clerk, will you please file the verdict sheets. Counsel and the parties, I will excuse you." The plaintiffs' attorney immediately asked if counsel could approach the bench. The jury remained in the box. During the ensuing bench conference, the plaintiffs' counsel said that the verdicts rendered were exactly the reason why he had believed that it was necessary to include an additional question on fraud inducing the contract. The court replied, "I see what you are saying." The plaintiffs' counsel then proposed to submit a supplemental verdict sheet, asking whether the fraud induced each plaintiff to enter into his or her employment contract. The plaintiffs' lawyer pointed out that the court had instructed the jury that it could award punitive damages if it found that the fraud arose out of the contract and the defendants acted with actual malice, or if the fraud induced the plaintiffs to enter into the contract and the defendants acted with implied malice. Therefore, the plaintiffs' attorney contended, the verdict as returned was an implicit finding that the fraud had induced the contract; submitting an additional question would clarify that implicit finding. Defense counsel objected to the jury being asked to return to the jury room to deliberate on the additional question.

The court decided to have the jury answer a supplemental verdict sheet. The jury found that both plaintiffs had been induced by fraud to enter into their employment contracts with the dealership. The court then excused the jury.

The dealership moved for judgment notwithstanding the verdict or for a new trial on all counts. At the hearing on this motion, the dealership argued that, because Bolton began his employment with the dealership on a salary basis, he could not have been induced to accept employment with the dealership by the misrepresentation as to its commission policy. Therefore, the dealership argued, any misrepresentation could not have induced Bolton to enter the contract but "arose out of the contract" within the meaning of *H & R Block, Inc. v. Testerman,* 275 Md. 36, 44–46, 338 A.2d 48, 53 (1975), and *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 528–530, 366 A.2d 7, 10–11 (1976). Consequently, the dealership contended, the jury's

finding that the dealership had not acted with actual malice precluded Bolton from receiving punitive damages. The court agreed, holding that, as a matter of law, Bolton had to prove actual malice in order to recover punitive damages, and the court granted the motion for judgment notwithstanding the verdict with respect to Bolton's punitive damages claim. The court denied the motion for new trial, and denied the motion for judgment notwithstanding the verdict with respect to Nails.

The dealership took an appeal to the Court of Special Appeals, arguing, *inter alia,* that the circuit court erred in submitting the supplemental question to the jury. Bolton cross-appealed, contending that the circuit court erred in granting the dealership's motion for judgment notwithstanding the verdict as to his punitive damages claim.

In a reported opinion, *S & R v. Nails,* 85 Md.App. 570, 584 A.2d 722 (1991), the Court of Special Appeals reversed the judgments and remanded the case to the circuit court for a new trial. The intermediate appellate court took the position that it was improper for the circuit court to have submitted the supplemental verdict sheet to the jury. The Court of Special Appeals set forth its holding as follows (85 Md.App. at 585, 584 A.2d at 729):

"We hold, therefore, that where a jury, which had been properly instructed, returns an apparent verdict, which is taken, the jury is polled, and the parties and counsel are excused, that verdict is final, there being nothing further for the jury to do; at that point, submitting additional issues or requiring further deliberation is no longer an option open to the court."

The intermediate appellate court further held that the ultimate punitive damages verdicts were ambiguous and inconsistent. The court was of the view that, even if it were appropriate to submit the supplemental verdict sheets to the jury, the supplemental verdicts did not resolve any ambiguities in the initial verdict sheets but, instead, created an inconsistency. The Court of Special Appeals set out and indicated agreement

with the following argument by the dealership (85 Md.App. at 589–590, 584 A.2d at 731):

> " 'Under the jury's findings that the fraud arose out of a contract and that there was no actual malice, a judgment for the defendant was mandated. Under the answer to the supplemental question, that the fraud induced the contract, coupled with the finding of implied malice, a judgment for each plaintiff was required. The two answers cannot be harmonized, are hopelessly inconsistent, and the trial judge erred in not granting a new trial based on the inconsistency.' "

The appellate court concluded that a new trial should be ordered.

The Court of Special Appeals, however, discussed some of the remaining issues for the guidance of the trial court on remand, stating (85 Md.App. at 592, 584 A.2d at 732):

> "We perceive no error in the court's submission of the punitive damages issue to the jury. As we see it, the totality of the circumstances was such as to provide an adequate basis upon which a jury could find malice. Furthermore, notwithstanding [the dealership's] arguments to the contrary, we are satisfied that the essential elements of fraud were sufficiently proven to have required submission of the issue to the jury. We think it important, however, to address the reliance element separately."

With respect to the "reliance element" of a fraud action, the appellate court went on to state that the "but for" test was required and that the plaintiffs' evidence was sufficient to meet the test. They had each testified that, although they did not know whether they would have taken the job if they had been told the truth about the commission system, the amount of money they would make was important to them. The Court of Special Appeals said that a permissible inference from this and other testimony was that the plaintiffs acted because of the misrepresentation, thus meeting the "but for" requirement. The intermediate appellate court suggested that the "uncertainty expressed in response to a question calling upon

the witness to speculate about what he or she would have done is not the equivalent of stating that he or she *did not rely* on the representation." 85 Md.App. at 594, 584 A.2d at 733–734 (emphasis in original).

The plaintiffs petitioned this Court for a writ of certiorari, arguing that it was permissible for the circuit court to submit the supplemental interrogatory to the jury, that the jury's ultimate verdicts were clear, that there was ample evidence for the jury to conclude that the misrepresentations at the time the plaintiffs were hired constituted fraud in the inducement and that such fraud induced each plaintiff to enter the contracts. The plaintiffs sought reinstatement of the jury verdicts, including the punitive damages determinations, as to both Nails and Bolton. The dealership also petitioned for a writ of certiorari, arguing that, in light of the "clear and convincing" standard of proof, there was insufficient evidence of "the reliance element of a fraud claim" to have submitted the fraud count to the jury, particularly when a "plaintiff is unsure of whether he would have acted differently 'but for' the . . . misrepresentation." We granted both petitions.[3]

---

3. In the circuit court, both parties and the trial judge proceeded as if the punitive damages claims were to be resolved in accordance with the principles set forth in *Wedeman v. City Chevrolet Co.*, *supra*, and *H & R Block, Inc. v. Testerman*, *supra*, and the trial judge instructed the jury in accordance with the *Wedeman* and *Testerman* cases. As previously indicated, *supra* n. 2, the *Wedeman* and *Testerman* cases were later questioned by some members of this Court in *Schaefer v. Miller*, *supra*, and were overruled in *Owens–Illinois v. Zenobia*, *supra*.

Relying on one of the opinions in *Schaefer v. Miller*, *supra*, the dealership in its brief argues that we should not apply the principles of *Wedeman* and *Testerman* in this case. Neither party, however, objected at trial to the application of the *Wedeman* and *Testerman* cases. As we stated in *Zenobia*, 325 Md. at 471, 601 A.2d at 658,

"our overruling of *Smith [v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972)] and our overruling the 'arising out of contract' principle of *Testerman* and *Wedeman* shall be retroactive as well as prospective. At the same time, however, a defendant in some other case may not complain about a trial court's application of *Smith* or the *Testerman–Wedeman* rule if the defendant failed to object or properly preserve the issue, and if the issue was not raised pursuant to Maryland Rule 8–131(b). *See Murphy v. Edmonds*, [325 Md. 342, 375, 601 A.2d 102, 118 (1992)] (no party questioned the applicability

## II.

### A.

This Court has consistently indicated that, in civil cases, a trial judge has the authority to have a jury deliberate further and amend its verdict as long as the jury has not been discharged and left the court room.   Thus, in *Gaither v. Wilmer*, 71 Md. 361, 18 A. 590 (1889), the jury returned an obviously incomplete verdict which purported to "find for the plaintiff" without specifying any amount of damages.   Before the jurors had left the court room, the judge asked the attorneys if they would agree to allow the verdict to be completed, but, just as in the instant case, the defendant's attorney refused.   The judge then had the clerk hearken and record the verdict, and dismissed the jurors, who then left the jury box.   Almost a week later, the judge "amended" the verdict by inserting an amount of damages, and rendered judgment on this "amended" verdict.   Although this Court reversed because the trial court should not have inserted an amount "several days after the jury had separated," 71 Md. at 364, 18 A. at 591, the Court continued as follows (71 Md. at 364–365, 18 A. at 591, emphasis added):

"The defect was discovered by the Judge when the verdict was handed to him before it was recorded, *and when the jury were in attendance in open court for the purpose of rendering their verdict.*   It was then competent for the jury to reject this verdict *in toto,* and find another, or to vary, or correct it.   The Judge, also, could then have sent them to their room, with instructions to correct this defect, whether

of the 'gross negligence' standard for punitive damages, and the issue was not raised by this Court under Rule 8–131(b); therefore, this Court would not apply a different standard); *Boyer v. State,* 323 Md. 558, 581 n. 15, 594 A.2d 121, 132 n. 15 (1991) (same)."
Furthermore, the question of the applicability of the *Testerman–Wedeman* principles was not raised in either petition for a writ of certiorari. Ordinarily, the Court will only consider issues raised in a petition or cross-petition.   *See* Rule 8–131(b).   Consequently, we shall treat this case as governed by the cases concerning punitive damages which, at trial, all parties and the trial judge deemed applicable, even though the holdings of those cases are no longer in effect.

counsel assented or not; and this was the course that should have been adopted. *Edelen v. Thompson,* 2 H. & G. 31."

In *Ager v. Baltimore Transit Co.,* 213 Md. 414, 418, 132 A.2d 469, 471 (1957), the jury deliberated for a lengthy period, returned to the jury box, announced that it was hung, and the trial judge stated: " 'I do discharge you from further consideration of the case.' " Before any jurors left the jury box, however, the trial judge changed his mind, decided that the jurors should deliberate further, and sent them to the jury room. In upholding the trial judge's action, this Court stated (213 Md. at 419, 132 A. at 472):

> "It was held in the case of *Koontz v. Hammond,* 62 Pa. 177, that, although the jury had been ordered discharged, they could still render a verdict as they had not separated or left the court room and their discharge had not been recorded. We think this was a proper ruling. It would seem a vain and futile holding to require the parties to undergo another lengthy trial, with its consequent expense and consumption of time, under the circumstances stated above."

*See Williams v. New York,* 153 Md. 102, 107, 137 A. 506, 508 (1927) (holding that it was error for a trial court to reconvene a jury to clarify its verdict after the jury was dismissed, the jurors had left the courtroom, and some of the jurors had left the courthouse); *Harris v. Hipsley,* 122 Md. 418, 425, 89 A. 852, 854 (1914) ("ordinarily the jury should not be permitted to amend [its] verdict after it has been recorded and the jury dismissed"). *See also, e.g., Traylor v. Grafton,* 273 Md. 649, 680, 332 A.2d 651, 670 (1975); *Bronstein v. American Ice Co.,* 119 Md. 132, 138, 86 A. 131, 133 (1912). *Cf. Hoffert v. State,* 319 Md. 377, 390–391, 572 A.2d 536, 543 (1990) (Chasanow, J., dissenting, and pointing out that a reason for ordinarily drawing the line at whether the jurors had dispersed is to guard against them having been subject to outside influence).[4]

---

4. There is authority that, in some circumstances, it may be permissible to allow a jury to render a verdict after it has disassembled. In *Harris v. Hipsley,* 122 Md. 418, 89 A. 852 (1914), this Court approved the reassembling of a jury for the purpose of rendering a verdict on the first

In holding that the jury's initial verdicts in this case became absolutely final when announced, when the jury was polled, and when counsel were told that they were excused, the Court of Special Appeals relied on *Hoffert v. State, supra,* 319 Md. 377, 572 A.2d 536. The *Hoffert* case, however, does not support the holding of the Court of Special Appeals in the case at bar.

*Hoffert* was a criminal case, in which the defendant was charged with (1) attempted murder in the first degree, (2) attempted murder in the second degree, (3) robbery with a deadly weapon, and (4) use of a handgun in the commission of a crime of violence. The "crime of violence," which was an essential element of the handgun charge, was the attempted murder or the robbery which were charged in the first three counts. The jurors were instructed, properly, that in order to convict Hoffert on the handgun charge, they must find that he was guilty of attempted murder in the first degree, or attempted murder in the second degree, or robbery with a deadly weapon, as charged in one of the first three counts. The jury returned from its deliberations and was asked for its verdicts. The foreman announced a verdict of not guilty on each of the first three counts and said nothing about the fourth count. The clerk then polled each juror to determine if these verdicts were unanimous, and the poll disclosed that they were. The clerk hearkened the jury to the first charge. The judge then addressed the jurors and told them: "Members of the jury, having received your verdicts here today your service in this case is now complete." 319 Md. at 381, 386, 572 A.2d at 538, 540. A juror interrupted the judge, calling

---

count of a complaint. While pointing out that "ordinarily the jury should not be permitted to amend [its] verdict after it has been recorded and the jury dismissed," 122 Md. at 425, 89 A. at 854, the Court concluded that "it was proper to have the jury in this case render the verdict directed by the Court on the issue which was not previously rendered simply because it was overlooked." 122 Md. at 427, 89 A. at 854. In *Edelen v. Thompson,* 2 H. & G. 31, 34 (1827), the jury rendered its verdict, dispersed, and was reconvened the next day to correct the verdict. This court upheld the trial judge's action because the correction occurred "before the verdict [was] recorded."

attention to the fourth charge. At that point, the judge asked the foreman about the handgun charge, and the foreman indicated a guilty verdict on that charge. A bench conference ensued, at which the prosecutor argued that a verdict on the handgun charge should be taken even if it would be inconsistent with the not guilty verdicts on the first three charges and even if it would violate the court's jury instructions. The judge gave counsel some time to research the matter and sent the jurors back to the jury room. After the recess, the jury was returned to the box, and a verdict was requested on the handgun charge. The foreman announced that the verdict on the handgun charge was "guilty," and a poll of the jurors disclosed that the guilty verdict was unanimous.

We held in *Hoffert* that the trial judge erred in having the jury render a verdict on the handgun charge after it had initially rendered its not guilty verdicts. A majority of this Court, in an opinion by Judge Orth, explained (319 Md. at 386, 572 A.2d at 540–541):

"[The trial judge] was encouraged to travel the primrose path by the prosecutor. What both the judge and the prosecutor overlooked was the effect of the not guilty verdicts on the viability of the trial.

"When the jury was polled on the verdicts of not guilty on the first three charges, *see* Md.Rule 4–327(e), and the poll disclosed that the verdicts were unanimous, the verdicts were final. *Smith v. State,* 299 Md. 158, 164–170, 472 A.2d 988 (1984); *Pugh v. State,* 271 Md. 701, 705, 319 A.2d 542 (1974). The verdicts were legally proper. They were not contrary to the law and, without more, were in full accord with the judge's instructions which properly reflected the law. Nor were they 'ambiguous, inconsistent, unresponsive, or otherwise defective.' *See Smith* [299 Md.] at 170, 472 A.2d 988. The verdicts stood complete without a verdict on the handgun charge. The guilt stage of the trial was over at that point. The jury had no further function to perform.... In the circumstances, the State was not entitled

to a verdict on the handgun charge. It follows that the judge erred in permitting the jury to return a verdict on the fourth count."

*Hoffert* is clearly distinguishable from the present case. It was a criminal prosecution and not a civil case. Moreover, the jury's initial verdicts were "not guilty." A majority of this Court believed that the initial verdicts implicated the criminal law principle "that once a verdict of not guilty has been rendered at the conclusion of a criminal trial, that verdict is final." *Pugh v. State,* 271 Md. 701, 705, 319 A.2d 542, 544 (1974). In addition, the majority in *Hoffert* was of the view that there was no ambiguity, defect, inconsistency, or incompleteness about the jury's initial verdicts. The initial verdicts were in accordance with the trial judge's instructions and with Maryland law. *See Mack v. State,* 300 Md. 583, 596, 479 A.2d 1344, 1350 (1984) ("the trial court was required to instruct the jury that the petitioner could not be found guilty of use of a handgun if found not guilty of either of the charged crimes of violence"). The *Hoffert* majority took the position that, while inconsistent jury verdicts in criminal cases may sometimes be "tolerated," the prosecution has no right to obtain a supplemental inconsistent jury verdict when the initial verdicts were complete, non-defective, unambiguous, consistent, and disposed of the entire case in accordance with the trial judge's instructions and the applicable law.

■ Consequently, the reliance by the Court of Special Appeals upon *Hoffert* was misplaced. Instead, the issue here is governed by this Court's opinions in *Ager v. Baltimore Transit Co., supra; Gaither v. Wilmer, supra,* and similar cases. In light of the opinions in these cases, we hold that, in a civil case, after a jury has rendered an initial verdict, the trial judge ordinarily may ask the jury to amend, clarify or supplement the verdict in order to resolve an ambiguity, inconsistency, incompleteness, or similar problem with the initial verdict, up until the jury has been discharged and has left the court room.

B.

The trial judge's submission of the supplemental verdict sheet to the jury was fully justified in this case. There was a degree of ambiguity and possible inconsistency in the jury's initial verdicts, and the supplemental verdict helped clarify the ambiguity and possible inconsistency. To some extent, the ambiguity in the jury's initial verdicts may have been due to the ambiguity and inconsistency inherent in the now overruled *Wedeman v. City Chevrolet Co., supra; H & R Block, Inc. v. Testerman, supra,* and their progeny. *See Owens–Illinois v. Zenobia, supra,* 325 Md. at 453–455, 601 A.2d at 649–650; *Schaefer v. Miller, supra,* 322 Md. at 313–321, 587 A.2d at 499–503. A brief discussion of the *Testerman* and *Wedeman* cases may be helpful.

In *H & R Block, Inc. v. Testerman, supra,* 275 Md. at 47–48, 338 A.2d at 54, this Court took the position that where tortious conduct "arose out of a contractual relationship," punitive damages were not recoverable on an "implied malice" basis and that "actual malice" was a prerequisite for the jury to award punitive damages. Punitive damages were sought in that case based upon the defendant's alleged grossly negligent conduct in holding its employees out as qualified tax consultants when they were not qualified, and in inducing the plaintiffs to enter a contract to have the defendant's employees prepare the plaintiffs' income tax returns. This Court held that the allegations of gross negligence and outrageous behavior, while sufficient to constitute "implied malice," did not amount to "actual malice," that the tortious conduct "arose out of a contractual relationship," and that, therefore, punitive damages were not recoverable because of the absence of actual malice.

About a year after *Testerman,* this Court in *Wedeman v. City Chevrolet Co., supra,* 278 Md. at 529–532, 366 A.2d at 11–13, refined its holding in *Testerman.* *Wedeman* was a fraud action by an automobile purchaser against the automobile dealer who sold her the car, based on the dealer's misrepresentations that the car had not previously been damaged.

The misrepresentations had occurred before the execution of the sales contract and had induced the purchaser to enter the sales contract. The Court of Special Appeals, attempting to apply the *Testerman* holding, decided that the purchaser was not entitled to punitive damages because there was no evidence of actual malice and because of the nexus between the tortious conduct and the contract. This Court reversed the judgment of the Court of Special Appeals, holding that a tort arises out of a contractual relationship within the meaning of *Testerman* only when "the contractual relationship preexisted the tortious conduct. . . . Thus, when one may be induced by fraud to enter into a contract, the tort in that instance cannot be said to arise out of the contractual relationship." 278 Md. at 529, 366 A.2d at 11. The Court in *Wedeman* held that punitive damages in that case were recoverable upon a showing of implied malice, *i.e.*, conduct "characterized by a wanton or reckless disregard for the rights of others." 278 Md. at 532, 366 A.2d at 13.

Turning to the case at bar, the jury had been instructed that, under the fraud counts, if the jury found that the fraudulent conduct had occurred after the parties had entered the employment contracts, the fraud would constitute "fraud [which] arises out of a contractual relationship . . . [, and] then, in order to award punitive damages, you ladies and gentlemen of the jury must find that the fraud was done with actual malice. . . . " The jury was further instructed that "[i]f the fraud is in the inducement to the contract—that is, there wasn't an original contractual relationship, but in order to induce an individual to . . . enter into a contract[,] they make the deliberate misrepresentations . . . and that the plaintiffs relied upon them," punitive damages could be awarded if the jury found implied malice. The trial judge went on to define implied malice.[5]

---

5. The trial judge's instructions concerning these matters are set forth in more detail in the Court of Special Appeals' opinion, *S & R v. Nails*, 85 Md.App. 570, 588–589, 584 A.2d 722, 730–731 (1991).

In light of the instructions and the jury's finding of no actual malice, the jury's award of punitive damages would appear to represent a jury determination that the misrepresentations induced the plaintiffs to enter the employment contracts and thus did not constitute tortious conduct arising out of a contractual relationship. Somewhat inconsistently, however, the jury also found that the tortious conduct arose out of a contractual relationship. Nevertheless, under *Wedeman* and the trial judge's instructions, if the fraud did arise out of a contractual relationship, it would not have been fraud in the inducement and a finding of actual malice would have been required to support an award of punitive damages. The supplemental verdict sheet, with specific findings by the jury that each of the plaintiffs had been induced by fraud to enter into the employment contracts, clarified the ambiguity in the initial jury verdicts and supported the award of punitive damages.

## II.

As previously mentioned, the dealership's certiorari petition presented the question of whether there was sufficient evidence of "the reliance element of a fraud claim" to have submitted the fraud count to the jury.

In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 300, 513 A.2d 882, 889 (1986); *Martens Chevrolet v. Seney*, 292 Md. 328, 333–334, 439 A.2d 534, 537–538 (1982); *James v. Weisheit*, 279 Md. 41, 44–45, 367 A.2d 482, 484–485 (1977); *Suburban Mgmt. v. Johnson*, 236 Md. 455, 460, 204 A.2d 326, 329 (1964);

*Schmidt v. Millhauser,* 212 Md. 585, 592–593, 130 A.2d 572, 575–576 (1957); *Appel v. Hupfield,* 198 Md. 374, 378–379, 84 A.2d 94, 95–96 (1951); *Gittings v. Von Dorn,* 136 Md. 10, 15–16, 109 A. 553, 554–555 (1920); *Donnelly v. Baltimore Trust Co.,* 102 Md. 1, 13, 61 A. 301, 306 (1905); *Boulden v. Stilwell,* 100 Md. 543, 552, 60 A. 609, 610 (1905); *Cahill v. Applegarth,* 98 Md. 493, 499–504, 56 A. 794, 795–797 (1904); *Robertson v. Parks,* 76 Md. 118, 131–133, 24 A. 411, 412–413 (1892); *McAleer v. Horsey,* 35 Md. 439, 452–454 (1872). As indicated above, the issue raised in the dealership's certiorari petition centers entirely on the fourth element, namely reliance on the misrepresentation.

█ In arguing that there was no reliance as a matter of law, the dealership points to the following question which was asked during the cross-examination of the plaintiff Bolton: "if you had been told at the time of hire about the 15 percent, . . . you would have still taken the job, would you not?" The same question, in substantially the same wording, was asked of the plaintiff Nails during cross-examination. Each plaintiff answered: "I don't know." The dealership quotes *Lustine Chevrolet v. Cadeaux,* 19 Md.App. 30, 35, 308 A.2d 747, 751 (1973), to the effect that, in order to establish the "reliance element" of a fraud claim, the plaintiff must show " 'that he would not have performed the act . . . but for the misrepresentation. . . .' " As in both courts below, the dealership argues in this Court that, because of the plaintiffs' equivocal answers to the above-quoted questions, the "but for" test was not met and, therefore, there was no reliance as a matter of law.

Of course, if the plaintiff establishes that he was entitled to rely on the misrepresentation and that the misrepresentation was the sole inducement for his action, so that the plaintiff would have acted differently "but for" the misrepresentation, the plaintiff has established the "reliance element" of a fraud claim. Nevertheless, a strict "but for" analysis is not the exclusive test for reliance. This Court has long recognized that the misrepresentation need not have been the only motivation for the plaintiff's actions; it is sufficient that the

misrepresentation substantially induced the plaintiff to act. In the leading case of *McAleer v. Horsey, supra,* 35 Md. at 453, the Court stated that if "the plaintiff mainly and substantially relied upon the fraudulent representation, he will have his action for damages, though he was in part influenced by other causes." *See, e.g., Brodsky v. Hull,* 196 Md. 509, 515–516, 77 A.2d 156, 159 (1950) (saying, in reference to the reliance element of a fraud claim, that "[a] fact is material if ... its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction"); *Ward Development Co. v. Ingrao,* 63 Md.App. 645, 655, 493 A.2d 421, 426 (1985).

The position that the misrepresentation need only be a substantial factor in influencing the plaintiff is reflected in the Restatement (Second) of Torts § 546 (1977), which states:

"The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss."

Comment b to that section explains:

"... the plaintiff must have relied upon the misrepresentation in incurring the loss. It is not, however, necessary that his reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is not even necessary that he would not have acted or refrained from acting as he did unless he had relied on the misrepresentation.... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision."

The same point was made by Dean Prosser (William L. Prosser, *The Law of Torts,* § 108, at 715 (4th ed. 1971)) as follows (footnotes omitted):

"[I]t is not required that the defendant shall have been the sole cause of the damage; and indeed it is seldom, if ever, that the plaintiff is not influenced to some extent by many

other factors, most of which are not connected with the defendant at all. It is enough that the representation has had a *material influence upon the plaintiff's conduct*, and been a *substantial factor in bringing* about his action. It is not necessary that the representation be the paramount, or the decisive, inducement which tipped the scales, so long as it plays a substantial part in affecting the plaintiff's decision. . . . The question becomes one of fact, as to whether substantial weight was given to the representation, and it usually is for the jury."

*See also* Restatement, *supra*, § 538. *Cf. Consumer Protection v. Consumer Pub.*, 304 Md. 731, 780–781, 501 A.2d 48, 74 (1985).

The evidence in this case discloses that the sum of money withheld from each plaintiff because of the 15% was significant. Moreover, the plaintiffs testified that they were told that their compensation would include 5% of the gross receipts from parts sold and services rendered by their respective teams. Finally, each plaintiff testified that the amount he or she was to be paid was of the "utmost importance" in determining to take the jobs. We agree with the Court of Special Appeals that the evidence was sufficient for the jury to have concluded that each plaintiff relied on the defendant's misrepresentations.[6]

---

**6.** As indicated earlier, in granting the defendant's motion for judgment notwithstanding the verdict with regard to the jury's award of punitive damages in favor of the plaintiff Bolton, the circuit court agreed with the defendant's argument that Bolton could not have been induced by the defendant's misrepresentations to enter the employment contract because Bolton began his employment on a salary basis. The effect of the Court of Special Appeals' judgment was to vacate the trial court's grant of the motion with regard to Bolton. The dealership does not in this Court reiterate this specific argument as to Bolton. Nevertheless, the argument is not persuasive. While Bolton's employment did not begin on a commission basis, the evidence was that, at the time he entered into the employment contract, it was represented to him that his compensation would later be changed to a commission basis, and that the commission would be 5% of the gross dollar value of parts sold and services rendered by his team. The jury was entitled to find that the misrepresentation concerning the calculation of Bolton's commission did influence him in entering the employment contract.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN FAVOR OF THE PLAINTIFF NAILS AND, AS TO THE PLAINTIFF BOLTON, TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THAT COURT WITH DIRECTIONS TO ENTER JUDGMENT IN FAVOR OF THE PLAINTIFF BOLTON IN ACCORDANCE WITH THE JURY'S VERDICT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE DEFENDANT.*