832 A.2d 247

**Carroll SASS**

v.

**Madonna ANDREW.**

**No. 798, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 17, 2003.

Cynthia E. Young, Annapolis, for appellant.

Sherita D. Harrison (J. Mitchell Kearney, Brown, Diffenderffer & Kearney, L.L.P., on brief), Baltimore, for appellee.

Argued before HOLLANDER, KENNEY and ADKINS, JJ.

HOLLANDER, J.

In this case, we must determine whether Madonna Andrew, appellee, produced sufficient evidence at trial to establish that

Carroll Sass, appellant, committed fraud in connection with an underlying contractual obligation. Andrew filed suit in the Circuit Court for Anne Arundel County against Sass and his company, "Atlantis Painting & Decorating, Inc." ("Atlantis"), as well as Stan Mell and his company, Innerstate Design Builders, Inc. ("Innerstate"), complaining about a home improvement construction project. As to Atlantis, Andrew alleged breach of contract, negligence, and fraud. But, Andrew sued Sass only for fraud.

By the time of trial in April 2002, Andrew had obtained default judgments against Mell and Innerstate in the amount of $21,000.[1] Accordingly, the case proceeded to trial as to Atlantis and Sass. During the trial, the court dismissed all claims against Atlantis, because Andrew had erroneously sued Atlantis as a corporate entity. As a result, the fraud claim against Sass was the only claim submitted to the jury. It found Sass liable for fraud, and awarded damages to Andrew in the amount of $28,797.

This appeal followed, in which Sass presents one question for our consideration:

Did appellee Andrew present evidence legally sufficient to support her claim of fraud in the inducement?

For the reasons that follow, we shall reverse.

## FACTUAL BACKGROUND

On December 5, 2000, appellee filed a nine-count complaint against Atlantis, Sass, Innerstate, and Mell in connection with a contract to construct a two-story addition to the home of her daughter and son-in-law. Andrew sued Atlantis for breach of contract (Count I); fraud (Count II); and negligence (Count III). In Count VIII, captioned "Fraud," Andrew sued Sass individually.

In her complaint, Andrew alleged, *inter alia*, that at a meeting with Mell in August 1999, Mell introduced Sass as his

---

1. Mell was also prosecuted criminally.

"business partner." Further, appellee alleged that on August 31, 1999, in the presence of Mell and appellant, Andrew entered into a "Contractor Agreement" (the "Contract"), "based upon the representation that both Mr. Sass and Mr. Mell would be building the addition on her home." In addition, Andrew averred that Sass "falsely represented to [appellee] that all work he contracted to perform would be completed by October, 1999 and that the work would conform to industry standards." Appellee further alleged that, by mid December 1999, the defendants had abandoned the project. According to Andrew, appellant's "misrepresentation intentionally defrauded [appellee,] who relied on the misrepresentation when it [sic] entered into the contract with Mr. Sass."

At trial, prior to opening statements, the court informed the jury as to the burden of proof required in both the breach of contract and fraud claims. As to fraud, the judge stated, in pertinent part:

> In this case, the Plaintiff has made an allegation of fraud against [Atlantis] and [appellant]. A party who contends fraud on the part of another has the burden of proving the claim by clear and convincing evidence. This is a higher standard than preponderance of evidence.

Andrew was the only witness for her case. She related that in 1999, when she was sixty-four years old, she experienced financial and medical problems. As a result, she decided that she "couldn't afford to keep [her] home anymore." Instead, appellee planned to sell her house and build an addition to the home of her daughter and son-in-law in Pasadena, where she would also live. She intended to use her life savings of $50,000 to do so.

At about the time that appellee sought estimates for construction of the addition, she received a flyer in the mail from Innerstate. Thereafter, she met with Mell, President of Innerstate. According to appellee, on two occasions in August 1999, when she met with Mell, he was accompanied by appellant.

Appellee understood that if she signed a contract with Mell by August 31, 1999, she would receive a fifteen percent discount. Accordingly, appellee paid a good faith deposit of $100 to Mell on August 4, 1999, and agreed to pay one-third of the Contract price upon execution of the Contract.

The following testimony is pertinent with regard to appellee's initial contact with Sass:

[APPELLEE'S COUNSEL]: Ms. Andrew did there come a time where you met [appellant].

[APPELLEE]: Yes, I did.

[APPELLEE'S COUNSEL]: And when was that?

[APPELLEE]: The first time was at my home on 170 West Meadow Road.

[APPELLEE'S COUNSEL]: And can you tell the Court what happened during that meeting?

[APPELLEE]: Mr. Stanley Mell and [appellant], they came to my home. And I had talked to Mr. Mell about, you know, the—what I had basically wanted in my addition. And, [appellant] was there and it was basically—*I had no conversation with Mr. Sass.*

(Emphasis added).

Further, Andrew testified that on August 31, 1999, she again met with both Mell and appellant at her home. Although the parties dispute what occurred during that meeting, it is clear that on that date appellee executed the Contract, which is on a form bearing the name "Atlantis Painting and Decorating Company." The Contract, admitted as an exhibit, purportedly bears three signatures: that of Andrew as "Owner"; "Carroll Sass MHIC 15381"[2] as "Contractor"; and "Stan Mell" as "Witness."

According to Andrew, both Mell and Sass were present when she signed the Contract. The following exchange is relevant:

---

**2.** "MHIC" is an abbreviation for Maryland Home Improvement Commission.

[APPELLEE'S COUNSEL]: Can you tell the Court what happened during that meeting [on August 31, 1999]?

[APPELLEE]: Basically, Mr. Mell and [appellant] came in and said hello. And then Mr. Stanley Mell put his briefcase on the dining room table. And pulled out the contract. And we sat at the dining room table. And he moved the contract over towards me.

And I said that I had to go get the cashier's check. And I got up from the table and I walked into the other room to get the check. And when I come back, he pushed the contract towards me and he said that it had already been signed. That all I needed to do was sign it.

[APPELLEE'S COUNSEL]: And where was [appellant] during this time?

[APPELLEE]: He was sitting to the side of Mr. Stanley Mell, on my left.

[APPELLEE'S COUNSEL]: Were you all in the same room?

[APPELLEE]: Yes.

In conjunction with signing the Contract, appellee tendered a cashier's check in the amount of $15,386.67 to Mell. Although Andrew believed she was entering into a Contract with Innerstate, "[r]epresented by Stan Mell," it was also her "understanding" that Mell and Sass "were partners." Moreover, appellee stated that she was aware that Mell did not have a MHIC license, but that appellant had the requisite license.

Appellee acknowledged that she did not read the Contract prior to signing it. Moreover, it was not until Mell and appellant left appellee's home that she noticed for the "first time" that the "top of the contract" said Atlantis Painting and Decorating Company, not Innerstate, and that appellant had signed the Contract as the Contractor. With regard to Atlantis, Andrew testified that she had "no idea who that was."

Under the terms of the Contract, appellee agreed to pay a total of $46,200 for the construction of the addition. Andrew

was to pay the remaining balance as various stages of the construction were completed.

The Contract does not contain specifics as to what work was to be performed. Although the Contract refers to drawings, they were not produced at trial, because appellee claimed she did not have any copies. The Contract provides, in part:

ARTICLE 1. SCOPE OF WORK

The contractor shall furnish all of the materials and perform all of the work shown on the drawings and/or described in the specifications . . .

ARTICLE 2. TIME OF COMPLETION ("Contingent upon Permit Approval")

The work to be performed under this Contract shall be commenced on or before Sept[ember] 10th, 1999 and shall be substantially completed on or before October 9, 1999. Time is of the essence. . . .

ARTICLE 3. THE CONTRACT PRICE ("Forty six thousand two Hundred & Sixty")

ARTICLE 4. PROGRESS PAYMENTS

A.  Excavation/Foundation 1st & 2nd . . . 7,693.33
    Floor Framing/Shell

B.  Exterior Doors & Windows . . . 7,693.33
    Roofing/Siding

C.  HVAC & Plumbing/Electrical . . . 7,693.33

D.  Insulate/Drywall/Paint . . . 7,693.33

ARTICLE 5. GENERAL PROVISIONS

1.  All work shall be completed in workman-like manner and in compliance with all building codes and other applicable laws.

2.  *The contractor shall furnish a plan and scale drawing* showing the shape, size, dimensions, and construction and other equipment specifications for home improvements, a description of the work to be done and description of the materials to be used and the equipment to be used or installed, and the agreed consideration for the work.

3. To the extent required by the law all work shall be performed by individuals duly licensed and authorized by law to perform said work.

4. *Contractor may at its discretion engage subcontractors to perform work hereunder,* provided Contractor shall fully pay said subcontractor and in all instances remain responsible for the proper completion of this Contract.

\*      \*      \*

12. Contractor shall not be liable for any delay due to circumstances beyond its control. . . .

13. Contractor warrants all work for a period of [blank] months following completion.

(Emphasis added).

Because permits were required for construction, the project did not get under way until early November 1999. In the meantime, after appellee signed the Contract, a representative of Innerstate took her to several places to select various materials for the project.

With regard to the project, it is undisputed that the cement foundation was laid and framing for the structure began. According to appellee, Sass worked on the framing. Appellee acknowledged that the project was "going along pretty good." Therefore, on December 11, 1999, she tendered a second check to Mell, in the amount of $7,693. Appellee claimed that, just a few days later, "they stopped coming."

When the work stopped, Andrew called Mell; he said "they would be back." But, she said that "[n]o one else came back." Appellee then contacted appellant, expressing concern about protecting the project from inclement weather. She wanted "a roof on the addition," because "the snow was getting in." Appellant told Andrew that he "didn't have the money," but that he could "probably come up and put a tarp on it." Sass never returned.

Without the benefit of any protective covering, snow fell on the structure. According to appellee, "all of the wood" got "wet." Appellee claimed that water was "laying on the ce-

ment floor" and "the wood [was] laying around." When further attempts to contact Mell proved fruitless, appellee hired other contractors, including Razorback Builders, to do roofing work, for which she paid $3,625 in February 2000.

In total, appellee expended $28,878.94 in payments to other contractors for roofing work, electrical wiring, the installation of shingles, windows, the addition of doors, a garage door, and siding work. Eventually, appellee exhausted her financial resources and was not able to complete the addition.

On cross-examination, appellee acknowledged that, before executing the Contract, her contacts were with Mell, not Sass. The following colloquy is noteworthy:

[APPELLANT'S COUNSEL]: Okay. And for whatever reason, you did, in fact, decide to go with Innerstate Design Builders, Inc. Correct?

[APPELLEE]: Correct.

[APPELLANT'S COUNSEL]: Okay. Atlantis Painting and Decorating, Inc., one of the Defendants in this case, they never gave you an estimate to do the job, did they?

[APPELLEE]: No.

[APPELLANT'S COUNSEL]: Carroll Sass, the Defendant to my right, he never gave you an estimate to do the job, did he?

[APPELLEE]: No, he didn't.

[APPELLANT'S COUNSEL]: Okay. Atlantis Painting and Decorating, Inc. never did any architectural drawings for the project, did they?

[APPELLEE]: No.

[APPELLANT'S COUNSEL]: Carroll Sass never presented you with any architectural drawings to do the project. Is that correct?

[APPELLEE]: That's correct.

[APPELLANT'S COUNSEL]: And, during that period of time when you were still considering as to whether or not to go forth with the contract, Mr. Stan Mell approached you

and stated that if, in fact, you entered into a contract by August 31st, there would be a certain discount. Correct?

[APPELLEE]: That's correct.

Moreover, appellee conceded that she had no relationship with Sass when she paid her initial deposit of $100 to Mell. The following testimony during cross-examination is noteworthy:

[APPELLANT'S COUNSEL]: Okay. And, upon that conversation, you gave him [i.e., Mell] $100.00 in cash earnest money to say that you were going forth with the contract. Correct?

[APPELLEE]: Correct.

[APPELLANT'S COUNSEL]: Okay. And certainly at that time, you had absolutely no idea of a company named Atlantis Painting and Decorating Company, correct?

[APPELLEE]: Right.

[APPELLANT'S COUNSEL]: And in fact, at that time you didn't know Mr. Sass either. Is that correct?

[APPELLEE]: That's correct.

[APPELLANT'S COUNSEL]: And after giving Mr. Mell that $100, there were a couple of other meetings and then eventually, Mr. Mell met with you and in addition, Mr. Carroll Sass was there on August 31st at the house at 4008 Mountain Road.

[APPELLEE]: That's correct.

[APPELLANT'S COUNSEL]: Okay. And at that time you certainly felt that you were entering into a contract with Innerstate Design Builders, Inc.

[APPELLEE]: That's correct.

[APPELLANT'S COUNSEL]: Represented by Stan Mell. Correct?

[APPELLEE]: Correct.

The colloquy set forth below is also illuminating as to Andrew's interaction with Sass:

[APPELLANT'S COUNSEL]: The first time you ever heard of Atlantis Painting and Decorating Company was

when you glanced over the contract that you had signed and that was after Mr. Mell and Mr. Sass had already left your house. Correct?

[APPELLEE]: That's correct.

[APPELLANT'S COUNSEL]: Okay. And on top of the contract you saw Atlantis Painting and Decorating Company and, again, you had no idea who that was. Correct?

[APPELLEE]: Correct.

Significantly, appellee never paid any money to Sass; she issued all of her checks to Mell. The following exchange is noteworthy:

[APPELLANT'S COUNSEL]: Do you have any canceled checks that you paid Atlantis Painting and Decorating, Inc. for this project?

[APPELLEE]: No.

[APPELLANT'S COUNSEL]: You paid them no money. Correct?

[APPELLEE]: Correct.

[APPELLANT'S COUNSEL]: Okay. Do you have any cancelled checks that you paid Carroll Sass for this project?

[APPELLEE]: No, I don't.

[APPELLANT'S COUNSEL]: You paid Mr. Carroll Sass no money for this project. Correct?

[APPELLEE]: Correct.

At the close of appellee's case, appellant moved for a "directed verdict." The court denied the motion.

Appellant was the only witness for the defense. His testimony differed markedly from appellee's in several important respects. Most notably, appellant testified that he did not enter into the Contract with appellee, and he denied that his signature appeared on the document. Moreover, Sass claimed that the actual Contract form was not one that Atlantis "normally uses" for its contracts. The following colloquy is relevant:

[COUNSEL FOR APPELLANT]: Now, on the bottom [of the Contract] is a signature that the [appellee] claims is

your signature. Is that your signature there where it says contractor signature?

[APPELLANT]: No, sir. I did not sign that.

[COUNSEL FOR APPELLANT]: Okay. With regard to the form of that contract. Is that the form that Atlantis Painting and Decorating Company normally uses with regard to entering into a contract?

[APPELLANT]: No, it isn't.

Appellant testified that for almost 25 years he has owned and operated Atlantis, an unincorporated "sole proprietorship." Claiming that he met Mell at a bar, Sass asserted that, in connection with Andrew's project, he was merely hired by Mell as a subcontractor to do the framing. Appellant maintained that he entered into an oral agreement with Mell to frame appellee's addition for "roughly" $3,000. Moreover, Mell provided the materials. Although Mell paid appellant $2000, Sass explained that he ceased working on the job in December 1999, when Mell stopped paying him and "the materials stopped showing up on the job."

Appellant acknowledged that he had never done commercial framing work prior to Andrew's addition, although he had done framing work for himself. At one point, Sass said that, prior to his work on appellee's project, he had done work for Mell at Mell's office. Later, appellant said he had never done any work for Mell before the work in issue. The testimony below is noteworthy:

[COUNSEL FOR APPELLEE]: [H]ow is it that you came to learn about this project?

[APPELLANT]: He was going to go out and find some work. And he wanted me to give him a price on what I thought it would cost to do the framing work on it.

[COUNSEL FOR APPELLEE]: Did he tell you that he had a prospect in Ms. Andrew and that he was trying to get her to sign a contract?

[APPELLANT]: Well, he just, you know said, he was trying to get work.

[COUNSEL FOR APPELLEE]: Did he tell you how much he was charging Ms. Andrew for the work?

[APPELLANT]: I wasn't really paying attention to exactly what the numbers were. I was just—he just showed me what the layout was and I tried to give him an estimate on what it would cost to frame it. And paint it and all. Put drywall in it.

[COUNSEL FOR APPELLEE]: Now, you had never done framing before. Is that correct?

[APPELLANT]: Well, I've done some framing, ye[a]h.

Sass acknowledged that at one time he had a general contractor's license. Although Sass had a MHIC license at the relevant time, he said he did not know whether Mell had such a license. He insisted that he did not allow Mell to use his MHIC license number, but noted that his MHIC number "was on the side of [appellant's] truck." Sass also conceded that it would be a violation of the law to do home improvement work without a MHIC license.

Appellant admitted that he joined Mell "once or twice" in meeting appellee before the construction project began. He could not recall the exact dates, however. In addition, he conceded that he rode in Mell's truck when they went to appellee's house. But, Sass denied that he and Mell were partners. He also insisted: "I didn't see the contract [when it was] signed [by appellee]."

Further, appellant maintained that he often meets with owners and general contractors in order to "give them prices." The following colloquy during cross-examination is relevant.

[APPELLEE'S COUNSEL]: Were you at Ms. Andrew's house on August 31, 1999?

[APPELLANT]: I couldn't tell you what day I was there. I can't remember that far back.

[APPELLEE'S COUNSEL]: Do you typically accompany a general contract [sic] to an owner's facility before actually doing work on it?

[APPELLANT]: I do it all the time. I got other general contractors. I go give them prices all the time.

[APPELLEE'S COUNSEL]: What other subcontractors on this particular project, Ms. Andrew's project, accompanied you to the project?

[APPELLANT]: I didn't meet any of them.

\*     \*     \*

[APPELLEE'S COUNSEL]: Do you have any recollection at all about the meetings with Ms. Andrew?

[APPELLANT]: Just vaguely what [Mell] told her how he was going to build it. Just basic stuff. Not no details.

[APPELLEE'S COUNSEL]: You heard Ms. Andrew's testimony that you were at the table at the time the contract was signed. Do you dispute that?

[APPELLANT]: I wasn't there when it was signed.

[APPELLEE'S COUNSEL]: You never recall seeing a contract on a table? Seeing her sign it?

[APPELLANT]: I seen some papers there. I wasn't paying attention. I didn't sit there and read them. Read over them.

[APPELLEE'S COUNSEL]: While you were there, reading them did Ms.—or not reading them, but not paying attention to them, did Ms. Andrew sign anything?

[APPELLANT]: I don't recall watch—seeing nobody sign anything.

[APPELLEE'S COUNSEL]: Mr. Sass, this is your company, is it not, Atlantis Painting and Decorating Company?

[APPELLANT]: Yes, sir.

[APPELLEE'S COUNSEL]: All right. And, this is your MHIC license number is it not? 15381?

[APPELLANT]: Yes, sir.

Sass reiterated that the Contract does not contain his signature. When appellee's counsel asked, "Do you know who signed this?", Sass responded: "I don't know. I know I didn't."

Appellant did, however, testify as to the genuineness of his signature on his 1996 income tax return, his Answers to Interrogatories, and his Response to Request for Production of Documents. Those documents were then introduced into evidence.

At the conclusion of the evidence, defense counsel again moved for a "directed verdict" as to both Atlantis and appellant. In regard to Atlantis, counsel argued: "There is absolutely no testimony whatsoever before this Court that any such corporation exists. And, in fact, the testimony from [appellant] is there was no such corporation. He has never been incorporated." As to Sass, appellant's attorney observed that Andrew "felt that she was entering into a contract with Innerstate ... [and] with Mr. Stan Mell. ... That is who she paid. ..." Defense counsel also said:

> [T]here is absolutely no testimony from the Plaintiff that she had any contractual relationship with Carroll Sass. Her testimony is that she again entered into a contract with either Innerstate ... and/or Stan Mell.

Appellee responded that Sass "falsely misrepresented to [her] that all work he contracted to perform would be completed by October, 1999 and that the work would conform to industry standards." Moreover, she claimed that appellant's "misrepresentation intentionally defrauded [appellee,] who relied on the misrepresentation when it [sic] entered into the contract with [appellant]."

The trial court denied the motion for judgment as to appellant, but granted Atlantis's motion for judgment.[3] It reasoned:

> Atlantis having been sued as a corporation and defense being that there is no proof or evidence to support a judgment against Atlantis Painting and Decorating, Inc., a

---

**3.** The court also denied appellee's motion to amend Counts I and III to include claims against Sass for breach of contract and negligence. Appellee did not challenge that ruling in a cross appeal, nor did she note a cross appeal challenging the ruling as to Atlantis.

corporation. The Court is persuaded to grant that motion given the evidence before me.

After the court dismissed the claims against Atlantis, the fraud claim against Sass was the only remaining count. Andrew asked the court to instruct the jury as to negligent misrepresentation, but the court declined to do so, stating: "I think that it is inappropriate to give the instruction on negligent misrepresentation. That is a separate tort. It hasn't been alleged. The focus of this case is whether [Sass] committed a fraud." Sass asked the court to instruct the jury as to fraud in the inducement, which the court agreed to do.

In its instructions to the jury with respect to fraud, the court relied on Section 9:14 of the MARYLAND CIVIL PATTERN JURY INSTRUCTIONS (3d. ed. 1993) ("MPJI"), at 236, which defines "Fraud in the Inducement." [4] The trial court stated:

Now, fraud or fraudulent inducement means that a party has been led to enter into an agreement to his or her disadvantage as a result of deceit. Deceit means that the person entered the agreement based on the other party's willful non-disclosure or false representation of a material fact, which the other party had a duty to disclose.

A fact is material if under all the circumstances a reasonable person would attach importance to that fact in deciding whether to enter into the agreement or the person willfully not disclosing or making the material misrepresentation knows the other party with whom he or she is dealing probably will regard it as important in determining whether to enter into the agreement[, e]ven though a reasonable person would not attach importance to it in determining whether to enter into the agreement.

Neither party noted any exceptions to the court's instructions.

In closing, appellee's counsel suggested that appellant schemed with Mell to induce Andrew to sign the Contract. In furtherance of the scheme, according to appellee, Sass allowed Mell to use Sass's MHIC license number. We quote at length

---

4. The court's instruction matched, verbatim, the text of MPJI § 9:14.

from the closing summations of counsel, because they help to elucidate the parties' respective theories of the case.

Appellee's lawyer argued:

Essentially, [appellant] will have you believe that he was duped just like Ms. Andrew was duped by Mr. Mell. But, you have to ask yourself what is wrong with this picture in light of all the evidence that you have heard.

There are certain things that just don't add up. They don't make sense. They are not logical. And you need to look hard at the evidence and consider the credibility of the witnesses.

Mr. Sass testified that he met Mr. Mell in a bar. He never met him before. Never did work for him before. He never did framing before. Nevertheless, he agreed to enter into a contract, a verbal contract, with Mr. Mell to do the framing.

He had no written contract with Mr. Mell or Innerstate. He didn't check into the background of Innerstate. He never tried to determine whether or not Innerstate had an MHIC license in order to do this work.

\*     \*     \*

So, either Mr. Sass is an incredibly poor businessman. Or, as we submit, he was partners with Mr. Mell. Mr. Mell was going to do the design work because that was what he was, Innerstate Design.

But he didn't have an MHIC license number. Maryland Home Improvement Commission, which you must have under the law in order to perform home improvements. So, they got together and they used Atlantis' MHIC license number.

Now, Mr. Sass acknowledges that he went with Stan Mell to meet Ms. Andrew at her house. If not once, then twice. . . . He was there at the time the contract was signed. Certainly, that is the testimony of Ms. Andrew.

He says he didn't see the contract signed. There were a lot of papers spread out on the table. He says he doesn't

remember there being anything signed. And he says he didn't sign the contract.

One thing you have to ask yourself is what was he doing there that early in the contract stage. Why was a subcontractor, who is only going to be doing the framing, there at Ms. Andrew's house, not once, but twice, before the contract was signed? And why weren't all the other subs there? Why not bring the roofer, or the plumber, or the electrician, or the concrete pourer?

He only had the framing, and, the painting, I guess, as well. So, I submit to you that this is further proof that they had an arrangement, again, where Mr. Mell would do the design and they would sign the contract under Atlantis, use their MHIC license, and do the construction, so that they would be operating within the law.

Now, you have heard Ms. Andrew's testimony. Ms. Andrew says she met with Stan Mell a few times. She met Innerstate. She was candid about the fact that she didn't know really who Carroll Sass was. He just showed up a couple of times with Mr. Mell.

\*       \*       \*

Carroll Sass admits that he signed the answers to interrogatories. He admits that he signed the request for production of documents. He admits that he signed the income tax form as well.

Compare that against the signature here on the contract. Obviously, you are the jury and you have to make that determination as to whether or not you think it is the same signature or not.

But, one thing you have to ask yourself is if this is the first time he has met Mr. Mell, where did he get the ability—where did he get a signature of Mr. Sass to copy? And how, did he do such a pretty good forgery, if, in fact, Mr. Mell was the one who signed it? I mean, these are questions that you have to take back there and make the determinations.

In summary, we believe that Mr. Sass induced Ms. Andrew into entering into this contract to build an addition on her house. Maybe, just maybe in the end, Mr. Sass—or Mr. Sass was duped by Mr. Mell, as well. I have no idea whether or not he collected that money or not.

Maybe he didn't get paid all he was supposed to get paid under the contract. But, clearly the evidence is clear and convincing that Mr. Sass induced Ms. Andrew to enter into this contract. And then ultimately, that contract was not fulfilled.

*     *     *

It is a tragic story. But you are here to decide the evidence today. And I think when you look at all the evidence and think about the stories that you have heard today, everyone's testimony, you will have no problem finding by a clear and convincing evidence, that Mr. Sass fraudulently induced Ms. Andrew to enter into this contract.

In his closing argument, Sass's attorney focused on fraudulent inducement. He said:

The fact of the matter is, Ms. Andrew said that she had no intention, did not know that she was entering into a contract with Carroll Sass. That her dealing was, in fact, with Mr. Stan Mell and Innerstate Design and Builders, Inc.

That, in fact, when she went down to pick out the various materials for the job, after signing the contract, that she went with the project manager from Innerstate Design and Builders, Inc.

She testified that the foundation was done. The testimony is that the foundation was done by some contractor, but that contractor was not hired by Carroll Sass.

They would have you believe that my client is basically the general contractor on this job and that he was out hiring other people to complete the job. The electrician. My client didn't hire an electrician. The roofer. My client didn't hire a roofer. The masonry man, concrete man, the plumber. My client hired none of those people.

He did go to work on the project. His testimony is that he was a subcontractor for Stan Mell. That he met him in a bar.

\*    \*    \*

I don't have any doubt whatsoever that the contracts or estimates that the Plaintiff has introduced and the monies that she said she paid these various people was paid by the Plaintiff.

I have no doubt whatsoever. But there is a giant leap to say that that was necessitated because something had not been completed on the original contract. Because you don't have any testimony and/or evidence as to what was supposed to be completed in that original contract.

\*    \*    \*

There is no fraudulent inducement. There is absolutely nothing that Ms. Andrew stated saying to you that I entered into this contract because Mr. Sass told me this.

Mr. Sass told me that I am the best builder in Anne Arundel County. Mr. Sass told me that I was the best framer in Anne Arundel County. Mr. Sass told me I was the best drywall hanger, finisher or best painter in Anne Arundel County.

There is nothing. The dealing, again, from the Plaintiff, she stated, was with Mr. Stan Mell and Innerstate Designers and Builders, Inc.

... But, she did testify that [she] sued Stan Mell. [She] sued Innerstate. And [she] got judgments against them.

\*    \*    \*

The person who the Plaintiff should have gone after, she did. The person who should have been punished in this case, was punished. Was found guilty of a criminal act. In fact, of two criminal acts. And was incarcerated, sent to jail for it.

The person who caused the financial damage to the Plaintiff, the Plaintiff got a judgment against. My client, again, did not enter into a contract with Ms. Andrew.

\*       \*       \*

But the culprit, the person who caused that, was not Carroll Sass. The one remaining count for you to make a determination on as to whether [or] not there was sufficient clear and convincing evidence, unambiguous evidence that my client fraudulently induced Ms. Andrew to enter into a contract.

Her testimony is that she didn't even know she was entering into a contract with anyone other than Stan Mell. I don't know how you can reach the conclusion that that was any type of fraudulent inducement from my client, Carroll Sass.

\*       \*       \*

I believe the decision, if you set aside the sympathy for Ms. Andrew, clearly should be for the Defendant, Carroll Sass. Carroll Sass was taken by Mr. Stan Mell, the same as Ms. Andrew was. Carroll Sass was not a general contractor on this job. Carroll Sass hired no other subcontractors on this job. He was simply a subcontractor.

In his rebuttal argument, appellee's counsel responded:

It is true, [appellee] didn't intend to enter into a contract with Atlantis. She was dealing with Stan Mell. And, although [appellant] came several times before the contract was signed, she admits that she thought that she was dealing with Innerstate.

But the fact is she entered into a contract with Atlantis. And we think we know the reasons why. She didn't know the reason at the time. And that is the nature of a fraud. You don't know what is going on at the time.

It is only later that it all becomes clear. And what was clear and what makes the most sense here is that Innerstate didn't have a MHIC license, couldn't do the construction themselves. They could go out and sale [sic] it. They could

go out and design it. But they couldn't construct it or else they were going to run afoul of the law.

So they hook up with Atlantis, who has an MHIC license and they get to sign it on the Atlantis contract. It is the only thing that makes sense.

[Appellee] testified that she thought they were partners. Why else was [appellant] there two or three times. Two times, one time, whatever it was before the contract was signed. She clearly was led to believe that they were partners. And that, you know, they were going to get this job done.

\*　　\*　　\*

[S]he had a contract with Atlantis. And she believes that she was fraudulently induced into signing that contract by Mr. Sass. And that he should be as responsible as Mr. Mell is for the damages that she has incurred.

The verdict sheet included the following question: "Do you find by clear and convincing evidence that Defendant Carroll Sass defrauded Plaintiff Madonna Andrew?" The jury found that appellant had defrauded appellee, and it awarded Andrew damages of $28,797.00. Thereafter, the court denied appellant's Motion for Judgment Notwithstanding the Verdict, Motion for New Trial, and request for Remittitur.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

This case is rooted in appellant's failure to satisfy his contractual obligations. Distilled to its essence, we must determine whether appellee proved, by clear and convincing evidence, that appellant committed fraud in connection with the Contract. *See Jacobs v. Flynn,* 131 Md.App. 342, 353, 749 A.2d 174, *cert. denied,* 359 Md. 669, 755 A.2d 1140 (2000). In our analysis, we assume "the truth of all credible evidence and all inferences of fact reasonably deducible from the evidence...." *Huppman v. Tighe,* 100 Md.App. 655, 663, 642

A.2d 309 (1994); *see Houston v. Safeway Stores, Inc.*, 346 Md. 503, 521, 697 A.2d 851 (1997); *Caldor, Inc. v. Bowden*, 330 Md. 632, 636, 625 A.2d 959 (1993). Moreover, any evidentiary conflicts are resolved in favor of appellee, as she is the one who prevailed below. *Caldor*, 330 Md. at 636, 625 A.2d 959.

■ As we noted, Andrew did not sue Sass for breach of contract. Given that appellee's only claim against appellant sounded in common law fraud, the elements of a claim of fraud frame our analysis. In *Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660 (1994), the Court of Appeals summarized the elements of a cause of action for fraud or deceit. In order to prevail, a plaintiff must prove:

1) that the defendant made a false representation to the plaintiff;

2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*See Maryland Environmental Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512 (2002); *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 703, 715 A.2d 188 (1998); *Le Marc's Management Corp. v. Valentin*, 349 Md. 645, 653, 709 A.2d 1222 (1998); *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 195, 665 A.2d 1038 (1995); *Gross v. Sussex, Inc.*, 332 Md. 247, 257, 630 A.2d 1156 (1993); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 584–85, 723 A.2d 502, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999); *see also* MPJI § 11:1, at 313.

■ A "false representation" is a statement, conduct, or action that intentionally misrepresents a material fact. *Parker v. Columbia Bank*, 91 Md.App. 346, 359, 604 A.2d 521,

*cert. denied,* 327 Md. 524, 610 A.2d 796 (1992); *Snyder v. Herbert Greenbaum & Associates,* 38 Md.App. 144, 148, 380 A.2d 618 (1977). A "material" fact is one on which a reasonable person would rely in making a decision. *See* MPJI § 11:4, at 320.

A defendant may be liable for fraud or deceit "only if he knows that his representation is false, or is recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 232, 652 A.2d 1117 (1995). Moreover, in order to recover for fraud, the misrepresentation must be made with the deliberate intent to deceive. *Wrexham Aviation,* 350 Md. at 704, 715 A.2d 188; *Ellerin,* 337 Md. at 230, 652 A.2d 1117.

Ordinarily, "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor,* 370 Md. at 97, 803 A.2d 512. Therefore, concealment of a material fact constitutes fraud only if there is a duty of disclosure. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 323, 389 A.2d 887 (1978); *Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 346, 612 A.2d 322 (1992). Nevertheless, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 239, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985).

At the outset of our analysis, we observe that there is some inconsistency, perhaps only semantic, in regard to the precise nature of the claim for which we must consider the legal sufficiency. In his brief, Sass argues that Andrew did not present legally sufficient evidence at trial to establish her claim of "fraudulent inducement." Appellee counters that she proved "fraud."

To be sure, appellee attempted to sue Sass for "fraud," as that is the caption of the one count in the Complaint applicable to Sass. And, it is clear that the court below recognized the

fraud claim because, in its preliminary instructions to the jury, the court told the jury that Andrew "made an allegation of fraud. . . ." On the other hand, in its final jury instructions, the court never advised that jury as to the traditional elements of fraud; it referred briefly to "fraud," "fraudulent inducement," and "deceit." As noted, neither side objected to the jury instructions. *See* Md. Rule 2–520(e).[5]

The crux of appellant's position is that there is a critical distinction between fraud and fraud in the inducement. He contends that only the claim of fraudulent inducement is at issue here, and argues that appellee never proved her claim of fraud in the inducement. To support his position that the jury was asked only to decide a fraudulent inducement claim, Sass seems to rely on the content of the court's jury instructions. Sass asserts: "In the absence of any objection to the failure to give a fraud instruction and the absence of any cross appeal, any claim that Count VIII was a claim for fraud, rather than fraudulent inducement, has been waived by Appellee."

As we see it, appellant's position ignores that the parties and the court used the terms "fraud" and "fraudulent inducement" interchangeably. Moreover, appellant seems to overlook that Count VIII was captioned "Fraud"; the court advised the jury about "fraud" in both its opening and closing instructions; and, without objection, the jury was asked on the verdict sheet to decide whether Sass "defrauded" Andrew.

Moreover, fraud in the inducement is a subspecies of fraud. Therefore, appellant's effort to distinguish the two does not advance his contention that he is not liable based on the theory of fraudulent inducement. We explain.

---

5. Appellant does not challenge the instructions, apparently recognizing that any claim of error has been waived. Maryland Rule 2–520(e) provides:

(e) **Objections.** No party may assign as error the giving or failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.

■ "Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir.1999) (footnote omitted) (applying Minnesota law). *See Wedeman v. City Chevrolet Co.*, 278 Md. 524, 529, 366 A.2d 7 (1976) ("[W]hen one may be induced by fraud to enter into a contract, the tort in that instance cannot be said to arise out of the contractual relationship. It is the tortious conduct which conversely induces the innocent party to enter into the contractual relationship."). *Councill v. Sun Ins. Office*, 146 Md. 137, 126 A. 229 (1924), is instructive in demonstrating that fraudulent inducement is simply a means of committing fraud.

In *Councill*, the Court of Appeals recognized that there are instances when the evidence in a particular case may give rise to an inference of fraudulent conduct; a promise made to induce another to execute a contract, which the promisor never intended to perform, may create liability for fraud. The *Councill* Court said: "[A] false promise, not intended to be performed, but made to trick and deceive another into the execution of a written instrument, is a fraud." *Id.* at 150, 126 A. 229. Further, the Court said, at *id.*:

It is true that in a sense a promise to do some act or refrain from some act in the future may establish a merely contractual relation, but where it is made with a fraudulent design to induce the promisee to do something he would not otherwise have done, it is more than that, it is a misrepresentation of the promisor's state of mind, which may be, and in a case such as that before us is, a very material thing.

Accordingly, we are satisfied that appellee alleged fraud, sought to prove fraud, and the jury was asked to decide if appellant committed fraud.

## II.

■ The question remains as to whether appellee produced evidence that was legally sufficient to support a finding that appellant committed fraud, whether by way of fraudulent

inducement or some other fraudulent conduct. In this regard, *Wrexham Aviation*, 350 Md. 693, 715 A.2d 188, is instructive.

In *Wrexham*, the appellants challenged, *inter alia*, the award of compensatory damages for fraud, claiming that "there was insufficient evidence for submission of the tort count to the jury." *Id.* at 702, 715 A.2d 188. According to the Court of Appeals, the "dispositive issue" on appeal was the question of "whether there was sufficient evidence of fraud for the case to have been submitted to the jury." *Id.* at 695, 715 A.2d 188. The Court determined that the evidence as to fraud was legally insufficient to justify submission of that claim to the jury. *Id.* at 703, 715 A.2d 188. In reaching its conclusion, the Court was mindful of the clear and convincing standard of proof applicable to fraud claims. It said:

> Our review of the record convinces us, particularly in light of the "clear and convincing" standard of proof, that there was insufficient evidence of either the knowledge element or the intent to deceive element for the tort count to have been submitted to the jury.

*Id.* at 706, 715 A.2d 188.

Although a fraud claim must be proved by clear and convincing evidence, *Wrexham Aviation*, 350 Md. at 704, 715 A.2d 188; *McGraw*, 124 Md.App. at 585, 723 A.2d 502, a recent opinion of this Court pointed out that the clear and convincing standard of proof pertains only to the burden of persuasion, not the burden of production. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md.App. 18, 53, 818 A.2d 1159, *cert. granted*, 376 Md. 49, 827 A.2d 112 (2003). Writing for the Court in *Darcars*, Judge Moylan explained that "[t]here is no correlation between the burden of persuasion and the burden of production." Further, he wrote: "Persuasion involves convincing a jury, as a matter of fact, to varying levels of certainty." Put another way, the burden of persuasion "is simply a verbal formula by which the law attempts to communicate to lay jurors some sense as to the degree of certainty they should feel before returning various types of verdicts." *Id.* at 54, 818 A.2d 1159.

The *Darcars* Court observed that the burden of production, which is central to the analysis of legal sufficiency, "does not fluctuate with fluctuations in the burden of persuasion." *Id.* As the Court explained, the burden of production "has nothing to do with whether evidence **should be believed.** Its concern is with the logical pertinence of evidence, **if believed,** validly to establish a required conclusion." *Id.* (Emphasis in *Darcars* ). The *Darcars* Court added: "The *prima facie* or legally sufficient case requires some competent evidence, which, **if believed and given maximum weight,** would establish all of the required legal elements of the tort. . . ." *Id.* (Emphasis in *Darcars* ).

We recognize that the Court of Appeals recently granted *certiorari* in *Darcars* to consider the following issue: "Does the clear and convincing burden of proof applicable to punitive damages claims bear on the trial court's legal determination of the sufficiency of the evidence to support those claims?" Nevertheless, based on this Court's decision in *Darcars,* which says that the clear and convincing standard is *not* applicable to a review of legal sufficiency in a fraud case, we shall assume that Andrew merely had to satisfy the threshold burden of production in order for her fraud case to proceed to the jury. Certainly, an analysis under the lesser standard inures to appellee's benefit. But, if appellee cannot satisfy a minimum burden of production, she obviously cannot meet the higher burden of persuasion.

When we analyze the evidence under the burden of production standard, we conclude that Andrew failed to satisfy that burden. We explain.

To support appellant's contention that Andrew failed to prove fraudulent inducement, appellant points to Andrew's own testimony, in which she admitted that she never relied on any representations made by Sass. Further, Sass maintains that "a promise to complete construction by a certain date cannot support an action for fraud, because it is a promise of a future event," and "[f]raud cannot be predicated on statements which are merely promissory in nature. . . ." In addition,

appellant states that, prior to Andrew's execution of the Contract, there was no evidence that he made any statements regarding "the quality of work." According to appellant, the Contract itself includes terms about completion and the quality of work, and appellee should have sought to remedy any unfulfilled promises by a breach of contract action, not a claim for fraudulent inducement.

As we see it, appellee's argument as to fraud divides along two paths: 1) Andrew claims that, when appellant executed the Contract, he had no intention of performing the underlying contractual obligations; and 2) appellant misrepresented his own identity, in that he knew Andrew thought she was contracting with Mell, yet Sass was the actual contractor.

Thus, a central premise of appellee's fraud claim is her contention that appellant executed the Contract without the present intention to perform. Appellee states: "Appellant admitted that he never intended to fulfill the terms set forth in the Contractor Agreement." Asserting that "promises made with a present intention not to perform them" amount to fraud, appellee contends that "[a]ppellant's willful non-disclosure of the fact that he was executing a Contractor Agreement as the Contractor which he had no intentions of performing, is actionable fraud under Maryland law."

In addition, appellee maintains that Sass knew "she believed that she was doing business with Mell and his company, Innerstate," yet he "never disclosed" that he was the actual contractor. She asserts: "[Sass] further testified that he was not, and never intended to be, the Contractor on the project, although Mell was not a licensed contractor." Appellee theorizes that because Mell did not have an MHIC license, Sass made his own license available to Mell. In appellee's view, she was induced by appellant's conduct to enter the Contract, because Sass "allow[ed] her to negotiate strictly with Mell and to execute the contract with the belief that she was entering into an agreement with Mell and Innerstate, when Mell ... was unable legally to enter into a Contractor Agreement with the Appellee or the Contractor."

■ We first address appellee's contention that appellant never intended to perform the Contract. We agree with Andrew that Maryland law recognizes "a cause of action for fraud predicated upon a promise made with a present intention not to perform it." *Finch,* 57 Md.App. at 232, 469 A.2d 867; *see Sims v. Ryland Group, Inc.,* 37 Md.App. 470, 472, 378 A.2d 1 (1977); MPJI § 11:3, at 319 ("A defendant's promise to do something may be a false representation if the defendant did not intend to do the promised act when the promise was made."). Indeed, the Court of Appeals has held that a "defendant's deliberate misrepresentation of his existing intentions, where the misrepresentation was material to the transaction giving rise to the alleged fraud, may form the basis for an action in fraud or deceit." *Alleco,* 340 Md. at 197, 665 A.2d 1038; *see Gross,* 332 Md. at 258, 630 A.2d 1156 ("making a promise as to a matter material to the bargain with no intention to fulfill it is an actionable fraud"); *Tufts v. Poore,* 219 Md. 1, 12, 147 A.2d 717 (1959)("The gist of the fraud in such cases is ... the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact non-existent. . . ."); *Councill,* 146 Md. at 150, 126 A. 229 (recognizing that a promise made without the intention to perform, but with intent to induce the promisee to act, may constitute fraud); *Bocchini v. Gorn Management Co.,* 69 Md.App. 1, 19, 515 A.2d 1179 (1986) (recognizing that a " 'promissory representation made with an existing intention not to perform is actionable for fraud,' i.e., that such a representation is regarded as one of present fact father than of future possibility.") (citation omitted).

Although Sass insisted that he never executed the Contract, that assertion carries no weight on appeal. It was the jury's responsibility to assess Sass's credibility and resolve the factual dispute as to whether appellant signed the Contract. *See Gerald v. State,* 137 Md.App. 295, 302, 768 A.2d 140, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001). In this endeavor, the trier of fact may determine the genuineness of a writing without the aid of an expert. *Parker v. State,* 12 Md.App. 611, 616–17, 280 A.2d 29 (1971); *see also DiPietro v. State,* 31

Md.App. 392, 397, 356 A.2d 599 (1976)(noting that an authentic writing need not already be in evidence). Maryland Code (1998 Rcpl.Vol.) § 10–906 of the Courts and Judicial Proceedings Article ("C.J.") provides: "Evidence of a disputed writing is admissible and may be submitted to the trier of the facts for its determination as to genuineness." The jury had several documents containing appellant's known signatures, which were available for its use to compare with appellant's purported signature on the Contract.

Notwithstanding appellant's vigorous protestations, it is apparent that, in reaching its verdict, the jury rejected Sass's claim that he did not execute the Contract. That finding is not clearly erroneous. Therefore, our consideration of the issues raised in this appeal must take into account the jury's implicit finding that appellant, not Mell, executed the Contract as the Contractor.

Even if Sass signed the Contract, however, we fail to grasp from that finding how Sass's conduct evidenced that he never intended to perform the Contract when he executed it. Indeed, we have searched the citations in the record extract identified by appellee in support of her repeated assertions that appellant admitted he never intended to perform the Contract when he signed it; we have found no such admissions by Sass.

Nor do we believe that appellant's conduct gave rise to a reasonable inference that he never intended to perform the Contract when he signed it. Proof by clear and convincing evidence requires more than the kind of surmise and conjecture on which Andrew relies. *See First Nat'l Bank v. U.S.F. & G. Co.*, 275 Md. 400, 411, 340 A.2d 275 (1975) ("When fraud . . . is imputed, something more than a mere preponderance of evidence must be produced. . . .").

Sass's failure to fully perform the Contract may well have amounted to a breach of the Contract. But, Andrew's position that Sass never intended to perform the Contract is belied by her undisputed testimony as to appellant's conduct; appellant took substantial action in furtherance of the Contract. Ac-

cording to Andrew, the project was "going along pretty good" and, as appellee acknowledged, Sass personally completed some of the framing at the job site. Indeed, so much work had been done that Andrew tendered a second payment to Mell. Sass's part performance was inconsistent with Andrew's contention that, when Sass executed the Contract, he never intended to perform.

As asserted in appellee's Complaint, Andrew also claimed that appellant "falsely misrepresented" that "all work he contracted to perform would be completed by October, 1999 and that the work would conform to industry standards." Further, she claimed that appellant's "fraudulent failure to perform under the terms of the contract" caused her to incur damages. Both parties agree, however, that "fraud cannot be predicated on statements which are merely promissory in nature, or upon expressions as to what will happen in the future." *Levin v. Singer,* 227 Md. 47, 63, 175 A.2d 423 (1961); *see Miller v. Fairchild Industries, Inc.,* 97 Md.App. 324, 342, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993); *Travel Committee v. Pan American World Airways, Inc.,* 91 Md.App. 123, 179, 603 A.2d 1301, *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992). In *Appel v. Hupfield,* 198 Md. 374, 379, 84 A.2d 94 (1951), the Court of Appeals explained:

Ordinarily fraud cannot be predicated on statements which are promissory in their nature, and therefore an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted. Failure to fulfill a promise is merely a breach of contract, which must be enforced, if at all, by an action *ex contractu.*

As noted, appellee also bases her fraud claim on appellant's failure to disclose that he, not Mell, was the contracting party. Appellee alleges that "she believed that she was doing business with Mell and his company, Innerstate," and appellant "never disclosed" that he was really the contractor. Therefore, appellee maintains that appellant defrauded her "by allowing her to negotiate strictly with Mell and to execute the contract with the belief that she was entering into an agreement with Mell and Innerstate, when Mell ... was unable

legally to enter into a Contractor Agreement with the Appellee or the Contractor."

The evidence before the jury may well have supported an inference that appellant allowed Mell to use Sass's name and MHIC license number, because Mell did not have one. But, there was no evidence that Sass made any express assertions to appellee that it was Mell who was the contracting party or that he (Sass) was not the contracting party. Indeed, appellee admitted that, at the time of Contract formation, she never spoke with appellant. Clearly, then, Sass made no affirmative misrepresentations by Andrew on which Andrew relied.

Instead, appellee apparently proceeded on the theory that Sass had a duty to disclose his identity or role in regard to the Contract. In effect, she suggests that appellant had a duty to *correct* appellee's misunderstanding as to the identity of the contractor, because the identity was a material fact. Andrew had to show that Sass intentionally concealed his role in order to induce Andrew to act, and that, because of the concealment, Andrew acted in a manner "different from how . . . she would have acted" had she known the truth. *See* MPJI § 11:2, at 317 (discussing elements of non-disclosure or concealment); *see also Lubore v. RPM Associates, Inc.*, 109 Md.App. 312, 329, 674 A.2d 547, *cert. denied*, 343 Md. 565, 683 A.2d 177 (1996).

In assessing appellant's failure to disclose that he was the actual contractor, we focus on what the jury could reasonably conclude about appellant's culpability in regard to appellee's mistaken belief that she was contracting with Mell. As we indicated, "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor*, 370 Md. at 97, 803 A.2d 512; *see Fegeas v. Sherrill*, 218 Md. 472, 476, 147 A.2d 223 (1958). The Court of Appeals has said:

> While it is not necessary to produce proof of wrongful conduct in order to succeed in establishing constructive fraud that justifies the rescission of a contract, a plaintiff still must show the "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the

law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests."

*Gaynor,* 370 Md. at 97, 803 A.2d 512 (citation omitted).

Appellee testified that she had no conversations with Sass before she signed the Contract, nor did she have any idea that she was contracting with him. Rather, she testified that she believed she was contracting with Mell and Innerstate. It was only *after* appellee signed the Contract, and after Sass and Mell left her home, that appellee realized that appellant, not Mell, had signed the document, and that it was on an Atlantis form. Clearly, then, appellant's execution of the Contract could not have been an inducement for Andrew to sign the Contract because, according to appellee, the Contract had already been signed when she signed it, and Andrew only discovered that Sass was the one who signed it as the contractor *after* he and Mell left her house.

It is also significant that appellee would have discovered appellant's role had she timely read the Contract. Because Andrew never read the Contract before signing it, however, she was unaware that it had been signed by Sass on an Atlantis form.

A misrepresentation is generally immaterial if the party to whom it is made reasonably could have ascertained the true facts. *See Carozza v. Peacock Land Corp.,* 231 Md. 112, 121, 188 A.2d 917 (1963). And, ordinarily, "a person who executes a document is legally obligated to read it before executing it." *Benjamin v. Erk,* 138 Md.App. 459, 481, 771 A.2d 1106, *cert. denied,* 364 Md. 461, 773 A.2d 513 (2001). As we recognized in *Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 629, 726 A.2d 818 (1999), " '[o]ne is under a duty to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents . . . .' " (Citation omitted). *See Kolker v. Gorn,* 202 Md. 322, 331, 96 A.2d 475 (1953) (recognizing that fraud may excuse a failure to uncover the true facts).

The fourth element of a fraud claim requires proof that "the plaintiff relied on the misrepresentation and had the right to rely on it." *Nails,* 334 Md. at 415, 639 A.2d 660. In determining if reliance is reasonable, a court is required to " 'view the act in its setting, which will include the implications and promptings of usage and fair dealing.' " *Giant Food v. Ice King,* 74 Md.App. 183, 192, 536 A.2d 1182, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988) (citation omitted). A strict "but for" analysis is not the exclusive test for the "reliance element" in a fraud claim, however. *Nails,* 334 Md. at 416, 639 A.2d 660. As the Court recognized in *Nails,* "the misrepresentation need not have been the only motivation for the plaintiff's actions; it is sufficient that the misrepresentation substantially induced the plaintiff to act." *Id.* at 416–17, 639 A.2d 660.

Under the facts attendant here, we conclude that it was unreasonable for the jury to determine that appellee relied on Sass's express or implied representations as to the identity of the contractor. In this regard, it is undisputed that Sass made no affirmative misrepresentations to Andrew; appellant's name was clearly disclosed on the Contract when appellee signed it; appellee conceded that she never looked at the Contract until *after* Sass and Mell left her home; appellee would have seen the names of Sass and Atlantis if she had looked at the Contract; and appellee made no claim that she was coerced into signing the Contract without reading it. Appellant's actions simply do not amount to clear and convincing evidence of fraud.

In sum, from the evidence before the jury, it could have reasonably concluded that appellant entered into the Contract with Andrew and that he breached it. But, there was insufficient evidence to establish that Sass never intended to perform or that appellee relied on appellant's representations as to the identity of the contractor.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED.**

**COSTS TO BE PAID BY APPELLEE.**