MARK A. PIZZO, UNITED STATES MAGISTRATE JUDGE
This is a breach of franchise agreement case involving a Maryland-based chicken wing franchise (Defendant franchisor Cluck-U Corp. and its sole shareholder, Defendant Pierre Haddad), a franchisee's attempt at a Florida location (Plaintiff Cluck-U Chicken, Inc. and its owner, Anthony Tartaglia), and the undoing of their business relationship. The parties have litigated in Maryland, where Defendants sued Plaintiffs, and in this Court, where Plaintiffs sued Defendants. The Maryland district court transferred its case here; then this Court consolidated the two cases, and the parties consented to my jurisdiction. Now, both sides have moved for summary judgments on the dozen-plus claims that are outstanding with both sides complaining about each other's conduct and egging each other on by hurling a hodgepodge of legal and equitable actions against each other (docs. 129, 130, 140, 142). The Plaintiffs say the Defendants breached the franchise agreement, committed business torts, and violated assorted statutes regulating such business transactions. The Defendants say the Plaintiffs violated the franchise agreement and then infringed their intellectual property rights during a limited temporal period after the two sides parted ways. And importantly, both sides say the other side made misrepresentations or material omissions leading up to their failed relationship. Having considered all the motions and responses, I grant Defendants' summary judgment motion (doc. 129) as to Plaintiffs' Florida Franchise Act claim (count two) and Florida Sale of Business Opportunities Act claim (count three). I also grant Defendant Haddad summary judgment on Plaintiffs' negligent misrepresentation and breach of contract claim. I also find that Plaintiffs' request for a declaratory judgment concerning the franchise agreement's non-compete provisions is moot, as are Defendants' claims for injunctive relief; otherwise, *1303 the motions are denied given the disputed factual landscape.[1]
A. Standards
Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c) ; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Jackson v. BellSouth Telecomm. , 372 F.3d 1250, 1279-80 (11th Cir. 2004). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. at 248, 106 S.Ct. 2505. Essentially, an issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case, and an issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Hickson Corp. v. N. Crossarm Co. , 357 F.3d 1256, 1259-60 (11th Cir. 2004).
The moving party bears the initial responsibility to inform the court of the basis for its motion and to identify the portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it contends demonstrate the absence of a genuine issue of material fact. Id. at 1260 (citing Celotex , 477 U.S. at 323, 106 S.Ct. 2548 ). For issues on which the non-movant bears the burden of proof at trial, the moving party may show the court that there is an absence of evidence to support the non-moving party's case, or it may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. Fitzpatrick v. City of Atlanta , 2 F.3d 1112, 1115-16 (11th Cir. 1993). Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial. Id. at 1116-17. In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor. Tolan v. Cotton, 572 U.S. 650, 134 S.Ct. 1861, 1863, 1866, 188 L.Ed.2d 895 (2014) ; Hickson , 357 F.3d at 1260. The court does not, however, weigh the evidence or make findings of fact. Anderson , 477 U.S. at 255, 106 S.Ct. 2505.
B. Undisputed Facts
The Cluck-U brand was created in 1985 by Robert Ilvento, who dropped out of Rutgers University to open his first chicken wing restaurant near that campus in New Brunswick, New Jersey. (doc. 131 at 4 (Ilvento Dep. 14:5-14) ) The concept of locating a fast-food chicken wing restaurant within walking distance of a college campus was a successful one. So successful that in the early 1990s, Ilvento began offering Cluck-U franchises for sale. (Ilvento Dep. 16:17-18) Around that time, Defendant Haddad opened a Cluck-U location in New Jersey with Ilvento as co-owner; Haddad eventually bought out Ilvento's interest in that location. (Ilvento Dep. 16:5-12)
*1304 He moved up in the pecking order to become Cluck-U's master franchise developer for Maryland and then, in 2000, Haddad bought the Cluck-U franchise rights outright from Ilvento for $ 400,000. (Ilvento Dep. 19:11-21; 25:6-9) As a part of the deal, Ilvento retained the right to sell Cluck-U sauces to grocery stores and restaurants and to receive royalties from then-existing locations. (Ilvento Dep. 13:7-16; 24:21-25:5; doc. 133-11 at 7 (Franchise Disclosure Document (FDD) at Item 1) )
Under Haddad, the brood of Cluck-U restaurants expanded to Maryland, North Carolina, Delaware, New Jersey, Ohio, Pennsylvania, Florida, and Lebanon. (see doc. 133 at 4 (Haddad Dep. at 14:14-15:15) ) In December 2012, at Plaintiff Tartaglia's initiative, Haddad and Ilvento met with Tartaglia (a Florida resident) in Maryland and hatched a plan to open a Florida restaurant. (Ilvento Dep. 26:7-10) Before signing the franchise agreement, Plaintiff Tartaglia traveled from Florida to Maryland to visit Cluck-U's corporate offices; he visited Maryland retail locations; and he recruited three other men - Phil Kahn, David Levine, and Paul DeCosta - to either invest in a Florida location or help him start one. (doc. 140-5, Tartaglia Dep. 109:15-22) At Tartaglia's urging, his ex-wife and employee, Cheryl Tartaglia, toured numerous Cluck-U locations on the east coast. (Tartaglia Dep. 141:24-142:1)
Cluck-U presented Plaintiffs with its standard franchise agreement and most recent franchise disclosure document dated October 2012. (doc. 1, ex. A) The parties executed the franchise agreement on May 21, 2013, with amendments signed in June and July 2013. (doc. 1, ex. A; doc. 133-11 at 238). The agreement includes a Maryland choice of law provision: "This franchise agreement and the construction thereof shall be governed by the laws of the state of Maryland without regard to its conflict of laws provisions." (doc. 1 at 75). Around that time, Tartaglia also signed an Independent Investigation Acknowledgment, which stated:
I have telephone or visited current Cluck-U Chicken restaurant(s). I base the decision to purchase a Cluck-U Corp. franchise solely and completely upon the findings of that independent investigation and the Franchise Disclosure Document provided to me by Cluck-U, Corp. and not on any oral representations whatsoever. I have thoroughly reviewed the Franchise Disclosure Document and all pertinent documents ... Cluck-U, Corp. is not responsible for the financial performance, or overall outcome, of the unit; this is my responsibility alone.
(doc. 129-2). Tartaglia signed a personal guaranty as well. It states:
The Guarantor[ ] hereby unconditionally, irrevocably and directly guarantee to Franchisor the prompt, punctual and full: (a) payment when due ... of all principal and interest, interest or principal, royalties, franchise fees, and of all other monies payable under the Agreement; and (b) performance when due of all covenants, promises, agreements, and the accuracy and completeness of all representations and warranties, contained in the Agreement.
(doc. 1 at 84).
In June 2013, Tartaglia, Kahn, and Levine signed a shareholder's agreement for Cluck-U Chicken, Inc., the company through which the franchise operated, with each shareholder owning one-third of the corporation. (doc. 129-4 at 2) Tartaglia also completed a written application for a Cluck-U franchise on behalf of himself and Plaintiff Cluck-U Chicken, Inc. Tartaglia, Khan, and DeCosta submitted personal financial profiles to Cluck-U as a part of the application process. (docs. 129-9; 133-10) In *1305 this paperwork, Tartaglia did not disclose that he had prior bankruptcy filings and a criminal conviction for writing a bad check. (Ilvento Dep. 45:20-46:6) Tartaglia also had a smaller income stream than he represented. (doc. 129-8 at 3) Sometime between June 2013, when he signed the Cluck-U Chicken, Inc. shareholder's agreement, and 2015, Tartaglia's share of the corporation was reduced to 1 percent. (doc. 129-5 at 4)
But accusations fly in both directions, with each side squawking that the other misrepresented key information. Defendants - for their part - did not provide Plaintiffs with quarterly updates to the October 2012 franchise disclosure document. The October 2012 franchise disclosure document was current through the end of 2011; it listed the locations of all Cluck-U franchisees as of 2011 but did not list 2012 store closures. The franchise disclosure document also estimated initial build-out costs to be between $ 65,000 and $ 80,000 (FDD at Item 7); Plaintiffs spent $ 350,000 renovating their leased space (Haddad Dep. 73:7-74:6); Defendants estimated total start-up costs to be between $ 250,000 and $ 350,000 (FDD at 1); and Plaintiffs spent more than $ 600,000 to get the franchise up and running. The franchise disclosure document estimated that the opening inventory would cost between $ 10,000 and $ 13,000 (FDD at Item 7); Plaintiffs spent $ 50,000. According to the franchise disclosure document, Defendants would train at least four of Plaintiffs' managers at an already-existing Cluck-U restaurant (not Plaintiffs' Florida location) and in a classroom setting for a minimum of four weeks (20 hours per week of classroom/computer training; 20 hours per week of on-site training). (FDD at Item 11) Defendants did not implement this training regime and instead sent a trainer to Plaintiffs' restaurant for an abbreviated period. (Haddad Dep. 115:21-116:4; 120:13-17) It is a chicken-or-the-egg scenario: Plaintiffs contend Defendants misrepresented start-up costs; Defendants retort that Tartaglia deliberately upgraded the Florida restaurant with expensive fryers and a point-of-sale system that was more sophisticated than the system utilized by all other locations, among other costly improvements, and insisted on operating as a sit-down (rather than a fast-food) restaurant. (Griggs Dep. 16:2-7, 12-16; Tartaglia Dep. 137:16-138:4)
Nonetheless, in February 2014, before the restaurant opened its doors, Tartaglia signed an Acknowledgment of Ready to Open for Business and a separate Acknowledgment of Completion of Franchisor Obligations. These documents stated: "We believe that we are ready to open for business and we have our staff trained and the store is completely done and stocked." (doc. 129-10). And: "We are satisfied that Cluck-U Corp. has completely met all their contractual obligations without exception, and has fully performed as per all the representations made in the Franchise Agreement, Franchise Offering Circular, and other disclosure documents." (doc. 129-11).
The restaurant opened in early 2014. Although non-party Khan was Plaintiffs' primary investor, Tartaglia ruled the roost and managed the Florida restaurant's daily operations. (Griggs Dep. 37:4-38:8) The restaurant never performed as well as Defendants had predicted and as Plaintiffs had imagined. The initial build-out cost more than projected; the opening inventory cost more; and the food and supplies cost more. Eventually, Tartaglia's ex-wife (they divorced in 2004), who had assisted with the build-out and was skilled at smoothing ruffled feathers between Tartaglia and Haddad, flew the coop. (doc. 140-2, Griggs Dep. 14:4-23; 15:8-14; 38:10-24) In February 2015, despite a grim outlook, *1306 Tartaglia put all his eggs in one basket. He contemplated doubling-down on his investment and emailed Defendant Haddad requesting a meeting "to go over the possibility of the purchase of Cluck-U-Corp. Also the future of our operation in North Port shall be discussed." (doc. 129-12). Haddad was receptive to the idea. (doc. 140-21)
Defendants attempted to assist Plaintiffs' bottom line by waiving royalties for the Florida location, permitting Tartaglia to deviate from standard menu offerings, and allowing him to purchase food and supplies from other vendors. (Ilvento Dep. 36:1-21; Haddad Dep. 79:8-23) ) But by July 2015, the sky was falling - the relationship between the parties had soured and business had not picked up. Plaintiffs demanded Defendants rescind the franchise agreement, claiming Defendants had not performed their obligations and had misrepresented the health of the franchise in the franchise disclosure document. (doc. 131 at 2, Tartaglia Decl. at ¶ 7) This ruffled Defendants' feathers - they refused. Plaintiffs put a fork in their Florida Cluck-U operation the next month. (Tartaglia Decl. at ¶ 8) Tartaglia operated the restaurant as Boardwalk Tony's until March 2016, when that restaurant closed for good without making a profit. (Tartaglia Decl. at ¶¶ 9, 16-17)
C. The Causes of Action
This case, which is the product of two separate causes of actions in two districts, is more complicated than it should be. Plaintiffs assert seven causes of action against each Defendant (doc. 1): fraudulent inducement (count one); violation of the Florida Franchise Act, Fla. Stat. § 817.416 (count two); violation of the Florida Sale of Business Opportunities Act, Fla. Stat. § 559.80, et seq. (count three); violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201, et seq. (count four); a declaratory judgment that the non-compete provisions of the parties' franchise agreement are unenforceable (count five); breach of the parties' franchise agreement (count six); and negligent misrepresentation (count seven).[2] All these claims center on nine alleged misrepresentations by Defendants: (1) Defendants told Plaintiffs that the franchise was growing but provided Plaintiffs with outdated information about the number of operating franchisees; (2) Defendants misrepresented the start-up costs for a Cluck-U operation; (3) Defendants did not follow through on their promise to provide Plaintiffs with site and market criteria; (4) Defendants did not provide Plaintiffs with lists of equipment with the build-out requirements necessary to start operating; (5) Defendants required Plaintiffs to purchase extra inventory just prior to opening that was not previously disclosed; (6) Defendants promised to provide formal training for employees, both in the classroom and at an existing Cluck-U location; this training did not occur; (7) Defendants did not assist Plaintiffs with advertising as promised; (8) Defendants said they would negotiate competitive prices for food and supplies on behalf of franchisees but did not; and (9) Defendants predicted Plaintiffs' location would be profitable. All but the last of these alleged misrepresentations relate to the franchise disclosure document rather than the franchise agreement. From all this, Plaintiffs contend the relevant facts (even when viewed from the Defendants' perspective) warrant summary judgment on their *1307 counts one, two, four, and five (doc. 130). Defendants, on the other hand, move for summary judgment on all of Plaintiffs' claims (docs. 129, 140).
Defendants countersue (doc. 94) for breach of franchise agreement; trademark infringement under federal and common law (for the time period when Plaintiffs ceased operating their restaurant under the Cluck-U name and instead operated as Boardwalk Tony's); trade dress infringement; unfair competition under federal and common law; trademark dilution; trafficking in counterfeit marks in violation of Maryland's business code; violation of Maryland's uniform trade secrets act; breach of guaranty agreement (against Plaintiff Tartaglia only); civil fraud (against Plaintiff Tartaglia only); intentional and negligent misrepresentation; unjust enrichment; and fraudulent conveyance. Defendants contend that it was Tartaglia who misrepresented information - they would not have sold him a franchise opportunity if they had known he had a low net worth and a past peppered with bankruptcies and financial troubles. Plaintiffs seek summary judgment on all of Defendants' claims (docs. 130, 142).
D. Choice of Law
Plaintiffs' portion of this case is grounded on diversity - a Florida franchisee suing a Maryland franchisor in federal court in Florida for breaches of a franchise agreement with a Maryland choice of law provision. Also thrown into the proverbial fryer are Plaintiffs' tort and statutory claims under Florida law. The result is a roux containing tort, contract, quasi-contract, statutory, and multi-state ingredients with conduct and laws regulating that conduct occurring in Florida and Maryland. And all this prompts choice-of-law questions: which state's laws govern which causes of action? Choice-of-law issues are often thorny, and the parties' wing-and-a-prayer pleadings and their confusing motions do not offer much clarity. For example, Plaintiffs appear to request summary judgment on all of Defendants' claims but do not organize their argument count-by-count; Defendants, for their part, argue against rescission as an available remedy but - again - do not proceed on a count-by-count basis. As explained below, the result - one I reached after disentangling the parties' slipshod arguments - is that Maryland law applies to all but Plaintiffs' FDUTPA claim, and Defendants are entitled to summary judgment on Plaintiffs' Florida Franchise Act claim (count two) and Florida Sale of Business Opportunities Act claim (count three). Having settled the choice-of-law score, and having considered the elements applicable for the remaining claims, disputed issues of fact exist.
1. Contract Claims
Federal courts sitting in diversity jurisdiction must apply the substantive law of the forum state, including its choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co. , 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ; Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc. , 92 F.3d 1110, 1115 (11th Cir. 1996). Under Florida law, a contractual choice-of-law provision is enforceable "unless the law of the chosen forum contravenes strong public policy." Maxcess, Inc. v. Lucent Techs., Inc. , 433 F.3d 1337, 1341 (11th Cir. 2005) (citation omitted). Here, Section XXI of the parties' franchise agreement contains this choice-of-law provision: "This Franchise Agreement and the construction thereof shall be governed by the laws of the State of Maryland without regard to its conflict of laws provisions." (doc. 1 at 75). The parties do not argue that Maryland law contravenes the public policy of either state, at least as to the breach of contract counts. This Court will apply Maryland *1308 law to the parties' breach of franchise agreement claims (Plaintiffs' count six) and to Plaintiffs' claim regarding the enforceability of the non-compete provisions of the agreement (count five).
2. Tort claims
The next question is whether the parties' choice of Maryland law to govern their franchise agreement encompasses Plaintiffs' tort claims, which are tied to the interactions that culminated in the franchise agreement. "In determining whether a choice of law clause contained in a contract between two parties also governs tort claims between those parties, a court must first examine the scope of the provision." Cooper v. Meridian Yachts, Ltd. , 575 F.3d 1151, 1162 (11th Cir. 2009) (citing Green Leaf Nursery v. E.I. DuPont De Nemours & Co. , 341 F.3d 1292, 1300 (11th Cir. 2003) ). Florida courts read choice of law provisions narrowly. Id. "[C]laims arising in tort are not ordinarily controlled by a contractual choice of law provision.... Rather, they are decided according to the law of the forum state." Burger King Corp. v. Austin , 805 F.Supp. 1007, 1012 (S.D. Fla. 1992) (citation omitted).
In Florida, courts apply the "most significant relationship test" to determine which state's law applies to tort claims. See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc. , 485 F.3d 1233, 1240 (11th Cir. 2007) ; Bishop v. Fla. Specialty Paint Co. , 389 So.2d 999, 1001 (Fla. 1980) ; Tune v. Philip Morris Inc. , 766 So.2d 350, 353 (Fla. 2nd DCA 2000). In evaluating which state has the most significant relationship to the facts giving rise to the tort, courts consider the factors set forth in § 145 of the Restatement (Second) of Conflict of Laws (1971): (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered. A court should evaluate these contacts " 'according to their relative importance with respect to the particular issue.' " Grupo Televisa , 485 F.3d at 1240 (quoting Restatement (Second) of Conflict of Laws § 145 (1971) ). The first contact is generally the most important, however, and "absent special circumstances, the state where the injury occurred would ... be the decisive consideration in determining the applicable choice of law." In re Takata Airbag Prods. Liab. Litig., 193 F.Supp.3d 1324, 1333 (S.D. Fla. 2016) (citations omitted). With these guidelines in mind, a court chooses the applicable law for each particular issue. Tune , 766 So.2d at 354.
In this case, Plaintiffs are a Florida resident and a Florida corporation with its principal place of business in North Port, Florida. Defendants are a Maryland corporation and a Maryland resident. The franchise location was in North Port, Florida, which is where Plaintiffs allegedly suffered their damages. But the franchise agreement is governed by Maryland law; Defendants made their alleged misrepresentations in Maryland; and Defendants' principal place of business is in Maryland. It is undisputed that Plaintiffs first approached Defendants in Maryland with the idea of opening a Florida location and visited Defendants' Maryland corporate offices and a retail location in Maryland before negotiating the franchise agreement. Plaintiff Tartaglia also testified to sending his ex-wife and former employee to franchise locations in New Jersey and Maryland in preparation for opening the Florida location. The franchise agreement was mailed from Defendants' Maryland office to Plaintiffs. Also established is that Defendant Haddad visited North Port, *1309 Florida at least three times to observe Plaintiffs' progress and to help them establish their location. Defendants sent a corporate trainer to North Port before the franchise opened for business.
Taking a bird's eye view of the case, I find that Plaintiffs' tort claims are inexorably tied to the transactions that culminated in the parties' franchise agreement. In fact, in each claim, Plaintiffs incorporate all of the allegations regarding Defendants' misrepresentations and omissions. Plaintiffs' complaint and the record evidence convince me that Plaintiffs' case centers on Defendants' misrepresentations in the franchise disclosure document, a document generated by Defendants' corporate office in Maryland. Defendants have no other franchisees in Florida. Maryland is hub of this dispute and has the most significant relationship to Plaintiffs' tort claims; therefore, I will apply Maryland law to Plaintiffs' fraudulent inducement claim (count 1), and negligent misrepresentation claim (count 7).
Plaintiffs' claim under FDUTPA is trickier - like Plaintiffs' common law tort claims, it does not arise out of a contract, and it does not exist solely for the benefit of the contracting parties. But FDUTPA has a broader statutory purpose to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). A FDUTPA claim is not defined by the express terms of a contract but instead encompasses unfair and deceptive practices arising out of business relationships. Siever v. BWGaskets, Inc. , 669 F.Supp.2d 1286, 1293 (M.D. Fla. 2009). Florida courts hold that a cause of action under FDUTPA serves as an independent statutory claim that is severable from all the remaining claims. See Motmanco, Inc. v. McDonald's Corp. , No. 3:04-cv-270-J-99HTS, 2005 WL 1027261, at *5 (M.D. Fla. Mar. 30, 2005) (collecting cases and quoting Mgmt. Comput. Controls, Inc. v. Charles Perry Const., Inc. , 743 So.2d 627, 632 (Fla. 1st DCA 1999) ). Here, there is an in-state franchisee and the allegedly unfair and deceptive acts culminated in Plaintiffs' build-out of a Florida location - this relationship to Florida supports the application of Florida law to Plaintiffs' FDUTPA claim (count four).[3]
3. Statutory claims
In count two, Plaintiffs allege Defendants' misrepresentations violated Florida's Franchise Act. Defendants urge me to grant them summary judgment on these claims, relying on the franchise agreement's Maryland choice of law provision. I agree with Defendants that by including a choice of law provision that provides for Maryland law to govern the franchise agreement, Defendants are subject to the dictates of Maryland's franchise act. Courts have determined that the choice of law provision in a franchise agreement that favors the franchisor's home state renders the franchisee's home state franchise act inapplicable to a dispute between the franchisor and the franchisee. Compare Dickinson v. Exec. Bus. Grp. , 983 F.Supp. 1395, 1397 (M.D. Fla. 1997), and Barnes v. Burger King Corp. , 932 F.Supp. 1441, 1442-43 (S.D. Fla. 1996)
*1310 (holding that parties' choice of law provision in franchise agreement rendered franchisee's home state franchise act inapplicable), with Austin , 805 F.Supp. at 1023 (applying Florida Franchise Act to an in-state franchisor and out-of-state franchisee when parties' choice of law provision selected Florida law). "Where the parties agreed to a choice-of-law provision in their contract, claims brought under the statutes of other states are generally inapplicable." Martin v. Creative Mgmt. Grp., Inc. , 10-cv-23159-WILLIAMS, 2013 WL 12061809, at *9 (S.D. Fla. July 26, 2013) (citing Dickinson , 983 F.Supp. at 1396-97 ).
In any event, application of different bodies of law to various contracts would likely render the franchise system unmanageable. Plaintiffs implicitly concede this: Defendants argue in their summary judgment motion that provisions in the franchise agreement disclaim Defendants' liability and excuse them from compliance with franchise laws. In response, Plaintiffs cite to Maryland's franchise law, which includes an anti-waiver provision that prohibits a franchisor from relying on disclaimers and integration clauses to defeat liability. This choice of law analysis as applied to Plaintiffs' claim under the Florida Franchise Act is dispositive of the claim. I find that Florida's franchise statutes are inapplicable to this dispute based on the parties' intent that Maryland law govern their franchise agreement, the dispute's contacts with Maryland, and the fact that neither side has argued that applying Maryland to this dispute is against Florida's public policy. Defendants are granted summary judgment as to Plaintiffs' count two.
In count three, Plaintiffs also allege that Defendants violated Florida's Sale of Business Opportunities Act, Fla. Stat. § 559.80, et seq. The parties do not argue choice of law issues regarding this count, but for the same reason I grant Defendants summary judgment on Plaintiffs' Florida Franchise Act claim, I grant them summary judgment on this statutory count as well.
E. Plaintiffs' Claims[4]
1. Fraud/Fraudulent Inducement (count one)
Defendants argue that they are entitled to summary judgment on Plaintiffs' fraud claim because it is barred under Maryland's economic loss rule. Plaintiffs, on the other hand, retort that the economic loss rule does not apply here and claim Defendants knew their statements were false when they made them and knew Plaintiffs would rely on these misrepresentations in deciding to purchase the franchise. Plaintiffs also argue they are entitled to summary judgment on their fraud claim because the undisputed material facts are that Defendants covered up the number of failing Cluck-U franchisees (among other things).
Under Maryland law, "fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." Hanley v. Doctors Exp. Franchising, LLC , ELH-12-795, 2013 WL 690521, at *16 (D. Md. 2013) (quoting Sass v. Andrew , 152 Md.App. 406, 832 A.2d 247, 261 (Md. Ct. Spec. App. 2003) ). For fraud, the plaintiff must show: (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either *1311 known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Nails v. S & R, Inc. , 334 Md. 398, 639 A.2d 660, 668 (1994). To be actionable, a false representation "must be of a material fact." Gross v. Sussex, Inc. , 332 Md. 247, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," Sass , 832 A.2d at 260, or a fact that "the maker of the misrepresentation knows ... [the] recipient is likely to regard ... as important." Gross , 630 A.2d at 1161. The misrepresentation must be made with the deliberate attempt to deceive. Sass , 832 A.2d at 260. The defendant must either know that the representation is false or be recklessly indifferent "in the sense that he knows that he lacks knowledge as to its truth or falsity." Ellerin v. Fairfax Savs., F.S.B. , 337 Md. 216, 652 A.2d 1117 (1995).
Because genuine issues remain as to whether Defendants in fact made materially untrue statements in violation of the franchise disclosure document and the franchise agreement and whether Plaintiffs reasonably relied on these statements, neither side is entitled to summary judgment on Plaintiffs' fraud count. For example, Plaintiffs contend it never would have entered into the franchise agreement if it had known that Ilvento still retained the rights to sell and market Cluck-U sauces to competing restaurants. Plaintiffs also argue that Defendants withheld market research that suggested the Cluck-U name was off-putting in conservative towns.
Although I deny summary judgment on this count, I make a few findings in hopes of focusing the parties at trial. First, as discussed above, Maryland law governs. Second, Maryland's economic loss rule does not apply because Plaintiffs are alleging Defendants' fraudulent statements induced them to enter into the contract in the first place. Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc. , 197 F.Supp.2d 298, 333 (D. Md. 2000). Third, the disclaimer provisions in the franchise agreement do not make Plaintiffs' reliance on Defendants' alleged misrepresentations unreasonable as a matter of law but instead may be relevant to the reasonableness of Plaintiffs' reliance.
In Maryland, "[i]naccurate projections of ... future profitability and inaccurate planning volumes could ... be considered fraudulent if there was evidence that the [defendant] knew they were inaccurate at the time they were made." Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc., 738 F.Supp.2d 640, 651 (D. Md. 2010). The same is true for misrepresentations about initial investment estimates. See A Love of Food I, LLC v. Maoz Vegetarian USA, Inc. , 795 F.Supp.2d 365, 375 (D. Md. 2011). The disclaimers in the franchise disclosure document and the franchise agreement remain factually relevant and may persuade the jury on the issues of materiality of the alleged misrepresentations and omissions and the reasonableness of Plaintiffs' reliance on them. See Hanley , 2013 WL 690521, at *29 (quoting Long John Silver's Inc. v. Nickleson , 923 F. Supp. 2d 1004, 1018 (W.D. Ky. 2013) ).
2. Negligent Misrepresentation (count seven)
Plaintiffs also allege the tort of negligent misrepresentation, a fallback position in the event they cannot prove fraud. Negligent misrepresentation arises "when the defendant owes a duty of care in communicating *1312 information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." Griesi v. Atl. Gen. Hosp. Corp. , 360 Md. 1, 756 A.2d 548, 553 (2000). The tort consists of these elements: (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence. Lloyd v. Gen. Motors Corp. , 397 Md. 108, 916 A.2d 257, 273 (2007).
Where the alleged negligence creates a risk of economic loss only, "an intimate nexus between the parties [i]s a condition to the imposition of tort liability." Superior Bank, 197 F.Supp.2d at 320 (citation omitted). This "intimate nexus" requires contractual privity, which is clearly present here. Id. And similar to Plaintiffs' fraud claim, this claim is not barred by Maryland's economic loss rule. Id. at 311. Summary judgment is inappropriate on this claim as well. With both sides pecking away at the other, the record contains disputed material facts concerning Defendants' knowledge, Plaintiffs' reliance, and causation.
3. Breach of Franchise Agreement (count six)
Plaintiffs allege Defendants breached their franchise agreement and the implied covenant of good faith and fair dealing. Maryland law applies to Plaintiffs' breach of franchise agreement claim, for the reasons already stated. I emphasize here that there is no independent cause of action for breach of the implied covenant of good faith and fair dealing in Maryland. Instead, it is "better viewed as an element of another cause of action at law, e.g., breach of contract...." Mt. Vernon Prop., LLC v. Branch Banking & Tr. Co. , 170 Md.App. 457, 907 A.2d 373, 381-82 (Md. Ct. Spec. App. 2006). Under Maryland law, the elements of a breach of contract are: (1) a contractual obligation; and (2) a material breach of that obligation. Chubb & Son v. C & C Complete Servs., LLC , 919 F.Supp.2d 666, 678 (D. Md. 2013) (citation omitted). The elements of a contract are offer, acceptance, and consideration. Id.
Plaintiffs allege the misrepresentations and omissions in the franchise disclosure document were material breaches of the franchise agreement; Defendants contend that Plaintiffs acknowledged that they had independently investigated the franchise, were ready to open for business, and unilaterally upgraded equipment and decor (which increased the amount of Plaintiffs' initial investment). With these basic facts in dispute, I deny summary judgment on Plaintiffs' breach of contract claim.
4. FDUTPA (count four)
A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. Rollins, Inc. v. Butland , 951 So.2d 860, 869 (Fla. 2nd DCA 2006). Although FDUTPA does not define "deception," the Act is "construed liberally." Fla. Stat. § 501.202. The Eleventh Circuit has stated that "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct." Cold Stone Creamery, Inc. v. Lenora Foods I, LLC , 332 F. App'x 565, 567 (11th Cir. 2009). A plaintiff must instead prove that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." Id. (citation omitted). So the standard is *1313 probable, not possible, deception that is "likely to cause injury to a reasonable relying consumer." Zlotnick v. Premier Sale Grp. , 480 F.3d 1281, 1284 (11th Cir. 2007).
Citing Federal Trade Commission regulation 16 C.F.R. § 436.9, incorporated into FDUTPA through Fla. Stat. § 501.203(3), Plaintiffs argue it was a deceptive act for Defendants to misrepresent the initial investment costs for franchisees, fail to update their financial and projected growth disclosures, and fail to train Plaintiffs' employees. Defendants respond that any misstatements or omissions in their October 2012 franchise disclosure document are technical only and not actionable.
The FTC promulgated a rule known as the Franchise Rule concerning disclosure requirements and prohibitions associated with franchising. It requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure document containing twenty-three categories of information. Plaintiffs' argument is that, under Florida law, Defendants' failure to strictly comply with the FTC's Franchise Rule is a per se deceptive and unfair trade practice. But this is not the law in Florida. Liability under FDUTPA requires more than a mere technical violation of the FTC's Franchise Rule. In the Eleventh Circuit, a party "must [also] prove that the alleged [deceptive or unfair] practice was likely to deceive a consumer acting reasonably in the same circumstances. Cold Stone Creamery, 332 F. App'x at 567.
Here, the parties agree that Defendants only provided Plaintiffs with the October 2012 franchise disclosure document and did not supply Plaintiffs with an update. The parties agree that the start-up cost estimate in the franchise disclosure document was far less than what Plaintiffs spent to get the restaurant ready to open. The parties also agree that Defendants did not train Plaintiffs' staff at an existing Cluck-U location. But these facts are not enough to establish Defendants' liability as a matter of law because Plaintiffs fail to offer evidence that Defendants' alleged violations of the Franchise Rule would have misled a consumer acting reasonably in the same circumstances. On the other hand, Defendants offer evidence that driving up the start-up costs were Plaintiffs' upgrades to the facility and restaurant equipment. These upgrades were not standard at Cluck-U's other locations and made training difficult. Summary judgment as to this claim is therefore inappropriate.
5. Plaintiffs' Declaratory Judgment Claim Regarding Non-Compete Provisions
Plaintiffs ask for a declaratory judgment that the post-termination non-compete restrictions in the franchise agreement are unenforceable. The parties do not dispute that Cluck-U Chicken, Inc.'s Florida location is closed. Also undisputed is that Plaintiffs operated the restaurant as Boardwalk Tony's for a short period of time after Defendants refused their request to rescind the franchise agreement. But the Florida location - be it Cluck-U Chicken or Boardwalk Tony's - is closed. Plaintiffs do not operate a restaurant from the facility and do not intend to reopen. These undisputed facts render moot Plaintiffs' cause of action for a declaratory judgment on the post-termination provisions in the franchise agreement.
In all cases arising under the Declaratory Judgment Act, 28 U.S.C. § 2201, the threshold question is whether a justiciable controversy exists. Atlanta Gas Light Co. v. Aetna Cas. and Sur. Co. , 68 F.3d 409, 414 (11th Cir. 1995) (citing *1314 Maryland Cas. Co. v. Pac. Coal & Oil Co. , 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941) ). Congress limited federal jurisdiction under the Declaratory Judgment Act to actual controversies, in statutory recognition of the fact that federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete cases or controversies. See Odyssey Marine Expl., Inc. v. The Unidentified Shipwrecked Vessel, et al. , No. 8:06-cv-1685-T-23MAP, 2012 WL 3541988, at *3, n.3 (M.D. Fla. Aug. 15, 2012). To avoid the court's issuing of an advisory opinion, the controversy "must be more than conjectural; the case must touch[ ] the legal relations of parties having adverse legal interests." Atlanta Gas Light , 68 F.3d at 414 (citation and internal quotations omitted). Supreme Court "decisions have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief' through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." MedImmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937) ). "[I]f the party's concern is the threat of future injury, 'there must be substantial likelihood that the plaintiff will suffer [such] future injury; a 'perhaps' or 'maybe' chance is not enough." Axis Surplus Ins. Co. v. Contravest Const. Co. , 921 F.Supp.2d 1338, 1343 (M.D. Fla. 2012) (quoting Malowney v. Fed. Collection Deposition Grp. , 193 F.3d 1342, 1347 (11th Cir. 1999) ).
I agree with Defendants and grant them summary judgment on Plaintiffs' claim for a declaratory judgment (count five). But this ruling clips Defendants' wings as well: the flip side is that Defendants' request for injunctive relief related to Plaintiffs' operations is similarly not justiciable. Defendants admit that Plaintiffs "are not currently using any of CUC's trademarks or trade secrets." (doc. 140-1 at 14) Consequently, I grant Plaintiffs summary judgment on Defendants' requests for injunctive relief in their counts two (federal trademark infringement), three (federal trade dress infringement), four (federal unfair competition), five (trademark dilution), six (common law trademark infringement), seven (common law unfair competition), and nine (Maryland's Uniform Trade Secrets Act). (doc. 94 at 40-57).
6. Plaintiffs' Claims Against Haddad Individually
Plaintiffs allege that Haddad violated FDUTPA individually. To proceed against an individual using a FDUTPA theory, an aggrieved party must allege that the individual was a direct participant in the improper dealings. "To hold an individual liable for corporate violations of the FTC Act, 'it is necessary to show that an individual defendant actively participated in or had some measure of control over the corporation's deceptive practices' and 'that the defendant had or should have had knowledge or awareness of the misrepresentations.' " SIG, Inc. v. AT & T Dig. Life, Inc. , 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013) (quoting KC Leisure, Inc. v. Haber , 972 So.2d 1069, 1073-74 (Fla. 5th DCA 2008) ) (emphasis in original).
Plaintiffs' complaint refers to "Defendants" collectively in each count without regard to corporate form, but in their motion Plaintiffs cite Haddad's deposition testimony that he is the sole owner and president of Cluck-U Corp., the sole officer authorized to make decisions for the company, and the only person responsible for preparing the financial disclosure document. (Haddad Dep. 32:17-19) Therefore, there are disputed facts regarding whether Haddad actively participated in or controlled *1315 Cluck-U's violations of the FTC's Franchise Rule and knew or should have known of the misrepresentations. Defendant Haddad is denied summary judgment on Plaintiffs' FDUTPA claim.
As for the remaining causes of action Plaintiffs assert against Haddad (fraud, negligent misrepresentation, breach of contract - all construed under Maryland law), he is entitled to summary judgment on all but the fraud claim. Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporate veil. Serio v. Baystate Props., LLC , 209 Md.App. 545, 60 A.3d 475, 484 (Md. Ct. Spec. App. 2013). Ownership of a corporation by a single individual is not sufficient on its own to pierce the corporate veil. See Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC , 929 F.Supp.2d 502, 516 (D. Md. 2013). In fact, Maryland law provides:
Although a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist ... shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.
Bart Arconti & Sons v. Ames-Ennis, Inc. , 275 Md. 295, 340 A.2d 225, 234 (1975). Here, although Plaintiffs allege that Cluck-U (through Haddad) made numerous fraudulent misrepresentations, these assertions are insufficient as a matter of law to sustain Plaintiffs' breach of contract and negligent misrepresentation claims against Haddad as the corporation's individual shareholder.
Plaintiffs' fraud claim against Haddad, on the other hand, survives. Construed in the light most favorable to Plaintiffs, there are disputed facts that Haddad was a knowing personal participant in the fraud. For example, Plaintiff cites to evidence that Haddad was responsible for the franchise disclosure document and the primary decision-maker for the franchisor.
F. Defendants' Counterclaims
Plaintiffs move for summary judgment on Defendants' claims, a baker's dozen of tort, contract, and trademark causes of action. But Plaintiffs' motion is not a model of clarity. Plaintiffs do not proceed through Defendants' claims count-by-count. They do not analyze (or even list) the elements of each cause of action or point to undisputed facts establishing that summary judgment is appropriate as to each claim. They request summary judgment on all of Defendants' claims but do not particularize their arguments. I will not do their work for them but make these observations.
First, as stated above, Plaintiffs are entitled to summary judgment on Defendants' requests for injunctive relief. Second, Plaintiffs ask me to find that Defendants violated the FTC's Franchise Rule. But this is not a private right of action, and as explained above, and technical violations of the Franchise Rule are not per se violations of FDUTPA. A triable issue exists regarding whether Defendants' representations and omissions were material and whether Plaintiffs reasonably relied on them. Third, Plaintiffs also ask for blanket summary judgment on all of Defendants' counterclaims because Plaintiffs are entitled to rescind the franchise agreement. The factual landscape detailed above, with each side alleging the other has unclean hands, does not establish Plaintiffs' right to this remedy as a matter of law. Fourth, without a hint at irony Plaintiffs argue Defendants *1316 cannot recover against Tartaglia based on the incomplete financial profile he offered when applying for a franchise, because "[w]here a party has ample time and ability to conduct an investigation into the legitimacy of another party, its failure to do so is attributable to a lack of due diligence, and it is precluded from asserting that it was inadequately informed." (doc. 130 at 23). I reject this argument. And, finally, I deny Plaintiffs' request for summary judgment on Defendants' counterclaims (again, a general request) based on Defendants' failure to exercise its option to take over the Florida restaurant's lease. Plaintiffs do not tie this argument to a particular count and I cannot make sense of it.
G. Conclusion
Upon consideration, it is ORDERED:
(1) Defendants' motion for summary judgment (doc. 129) is GRANTED in part and DENIED in part. Defendants Cluck-U Corp. and Jean Pierre Haddad are granted summary judgment on Plaintiffs' counts two (Florida Franchise Act), three (Florida Sale of Business Opportunities Act), and five (declaratory judgment regarding non-compete provisions) (doc. 1). Defendant Jean Pierre Haddad is granted summary judgment on Plaintiffs' counts six (breach of contract) and seven (negligent misrepresentation) (doc. 1). The motion is otherwise denied; and
(2) Plaintiffs' motion is partial summary judgment (doc. 130) is GRANTED in part and DENIED in part. Plaintiffs are granted summary judgment on Defendants' requests for injunctive relief on Defendants' counts two (federal trademark infringement), three (federal trade dress infringement), four (federal unfair competition), five (trademark dilution), six (common law trademark infringement), seven (common law unfair competition), and nine (Maryland's Uniform Trade Secrets Act) (doc. 94 at 40-57). The motion is otherwise denied; and
(3) Defendants' motion to strike (doc. 146) is DENIED.
DONE and ORDERED in Tampa, Florida on June 6, 2017.

Defendants also move to strike Plaintiffs' response to their summary judgment motion, arguing Plaintiffs filed it three days late (doc. 146). I deny Defendants' motion to strike and address the merits of the motions.

Plaintiffs asserted an eighth cause of action under the Sherman Act, 15 U.S.C. § 1, which they voluntarily dismissed (doc. 148).

Plaintiffs argue that Florida law also applies because Maryland's deceptive trade practices act "does not apply to business entities." (doc. 142 at 12). There is no competitor standing under Maryland's deceptive trade practices act, see Penn-Plax, Inc. v. Schultz, Inc. , 988 F.Supp. 906, 910 (D. Md. 1997), but Plaintiffs do not point me to a case that stands for the broader proposition that business entity-consumers cannot sue under the act. In any event, the issue is inapposite as I find that Florida law governs for other reasons.

I will discuss Plaintiffs' tort claims, applying Maryland law, before analyzing Plaintiffs' FDUTPA claim under Florida law. Then, I will evaluate Plaintiffs' request for declaratory relief under the Declaratory Judgment Act. Lastly, I will address Plaintiffs' claims against Haddad individually.